ROBERT ZELLNER,
a Wisconsin resident,

'08   APR 16   A9 :01

Plaintiff,

v.

JON W. SANFILIPPO
CLERK

DARYL HERRICK, a Wisconsin resident,
Individually and in his official capacity as
Superintendent of the Cedarburg School District,

JOHN PENDERGAST, a Wisconsin resident,
Individually and in his official capacity as
President of the School Board for the
Cedarburg School District,

Case No. 08-C-0315

JAMES R. KOROM, A Wisconsin resident,
Individually and in his official capacity as
legal counsel to the Cedarburg School District,

LINDA BORKENHAGEN, a Wisconsin resident,
Individually and in her official capacity as
Director of Information Technology for the
Cedarburg School District,

and

CEDARBURG SCHOOL DISTRICT, a
municipality duly incorporated under the
laws of the State of Wisconsin,

Defendants.

## COMPLAINT

Plaintiff brings this action (i) for retaliation against him for exercising his First
Amendment rights; (ii) for deprivation of his Fifth Amendment liberty interest without Due
Process, and (iii) for conspiracy to violate his civil rights, to recover compensatory and punitive

1

damages for the humiliation, embarrassment, economic loss, loss of employment, loss of prospective employment, and irreparable damage to his reputation in the community and in his profession directly and proximately caused by the willful, malicious and wrongful conduct of the defendants, jointly and severally, all acting under color of state law.

## Jurisdiction

1.　Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983, the First and the Fourteenth Amendments to the United States Constitution and 28 U.S.C. §§ 1331 and 1332. The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this cause of action.

2.　The amount in controversy exceeds $75,000.00, excluding interest and costs.

## Venue

3.　Venue is appropriate in this District under 28 U.S.C § 1391.

## Parties

4.　Plaintiff Robert Zellner ("Mr. Zellner") was at all times material a citizen of the United States and a resident of the State of Wisconsin, and a teacher at Cedarburg High School. During the period from July of 2003 through June of 2005 he was the President of the Cedarburg Education Association.

5.　Defendant Daryl Herrick, ("Superintendent Herrick") was at all times material a citizen of the United States, a resident of the State of Wisconsin, and the Superintendant of the defendant Cedarburg School District.

6.　Defendant John Pendergast ("Board President Pendergast") was at all times material a citizen of the United States, a resident of the State of Wisconsin, and the President of the Cedarburg School Board.

2

7.      Defendant James R. Korom ("Attorney Korom") was at all times material a citizen of the United States, a resident of the State of Wisconsin, and legal counsel to the Cedarburg School District.

8.      Defendant Linda Borkenhagen ("IT Director Borkenhagen") was at all times material a citizen of the United States, a resident of the State of Wisconsin, and the Director of Information Technology (IT) for the Cedarburg School District.

9.      Defendant Cedarburg School District ("the District") was at all times material a municipality duly organized under the laws of the State of Wisconsin represented by the Cedarburg School Board (the "School Board"), whose president was defendant Pendergast.

### Factual Background

10.     Mr. Zellner was a biology teacher at Cedarburg High School commencing in the 1995-1996 school year; he was the union representative and negotiator for the Cedarburg Education Association (the "teachers' union") during the 2002-2003 school year; and he was the president of the teachers' union during the 2003-2004 and 2004-2005 school years ended June 30, 2005. Prior to his termination on January 17, 2006, he had an unblemished record and positive evaluations that stressed that he had excellent job knowledge, that he shared his time freely with students and colleagues, and that he had a teaching style that was creative, motivated and engaging.

11.     In April 2003, without just cause, Superintendent Herrick attempted, but failed, to terminate the employment of Jay Grieger, the principal of Cedarburg High School at that time, injuring Mr. Geiger in his reputation and profession.

3

12.    In his capacity as union representative and one of the negotiators for the teachers' union, Mr. Zellner spoke out against Superintendent Herrick and the School Board on this matter of public concern. On May 22, 2003, together with 57 other Cedarburg High School staff members, Mr. Zellner published a one-half page statement addressed "To the citizens of the Cedarburg School District" in the *Ozaukee County News Graphic*.

13.    That published statement not only detailed Superintendent Herrick's discredited testimony against Grieger but went on to state that: "...Dr. Herrick and the Cedarburg School District have created an atmosphere of uncertainty, distrust, and intimidation between the district administration and the Cedarburg High School staff, by pursuing an unwarranted case against Mr. Grieger, using taxpayer money for attorney fees and additional school resources to pursue this unwarranted case; and damaging the excellent reputation of Cedarburg High School."

14.    During this same period of time, one of Mr. Zellner's astronomy students reported to him that, while completing an assignment to prepare and deliver a power point presentation to Mr. Zellner's class, when the student simply turned off the filter on a school district computer, the results of his "Google image search" included a number of "adult" websites.

15.    When Mr. Zellner reported his student's complaint to IT personnel in the high school library, and asked whether the School District could install any commercially available software to block inappropriate material from being accessed on school district computers, he was informed that no such blocking software had been installed by the School District because it was the position of IT Director Borkenhagen that to do so would limit students' access to information. School District IT Department personnel specifically directed Mr. Zellner to instruct his students to report to him any inappropriate material found by t hem when conducting

4

"Google image searches" on school district computers, and that he should pass that information on to them.

16.    Using the web site www.whitehouse.org as an example, IT Director Borkenhagen instructed Mr. Zellner and all teachers employed by the School District who were trained to use computer technology to screen websites prior to using them with students; and IT Department personnel assured Mr. Zellner that it was not only permissible for him to use his school district computer to conduct Google image searches for screening purposes, but that he was expected to conduct such Google image searches from time to time.

17.    In November 2003, in his capacity as president of the teacher's union, Mr. Zellner spoke out on another matter of public concern when he refused to agree to the refinancing of an unfunded liability proposed by Superintendent Herrick because to do so would jeopardize the teachers' benefits in the event that a Qualified Economic Offer ("QEO") was implemented.

18.    Shortly thereafter, following a particularly acrimonious budget meeting in December 2003, an angered Superintendent Herrick informed Mr. Zellner "as a courtesy" that months earlier an unnamed, but "prominent member of the community" had claimed that he (Zellner) was "into pornography", but that "it had nothing to do with [Mr. Zellner's] employment". At the same time, however, Superintendent Herrick told Mr. Zellner that "the gloves would come off", thereby causing Mr. Zellner to construe Superintendent Herrick's "courtesy" comments as a veiled threat on his part to cause malicious rumors to be spread against Mr. Zellner in retaliation for his refusal to agree to the proposed refinancing of the unfunded liability and because he had repeatedly spoken out against Superintendent Herrick on a number of other matters of public concern.

5

19.     Shortly thereafter, also in December 2003, acting on behalf of the executive committee of the teachers' union, Mr. Zellner presented a survey to the teacher's union membership relating to the job performance of each of the School District's administrators, including the principals and vice principals, the superintendent and the directors of IT and finance, among others.

20.     When Mr. Zellner attempted to present those survey results to the School Board at a closed session meeting, Superintendent Herrick directed the members of the School Board not to open the copies of the membership survey results that were provided to them; and they complied with his directive. To no avail, a follow-up letter was sent to the School Board members, imploring them to consider the survey results.

21.     During Spring 2004, while preparing a power point presentation for his class, Mr. Zellner disabled the filter on his school district computer, just as his student had been able to do using a school district computer the year before. For the express purpose of determining whether by that time the School District had finally caused commercially available software to be installed on school district computers to block access to inappropriate material, Mr. Zellner conducted a "Google image search" using the search term "Venus". When his search results included a number of adult website addresses, he reported this to members of the School District's IT Department, and he was again told that no software would be installed on school district computers to block access to inappropriate material; and that he should continue to instruct his students prior to their being assigned to use Google image searches to prepare their power point presentations for class, that they should report to him if any inappropriate images were included in their search results.

6

22.     In his capacity as president of the teacher's union, Mr. Zellner again spoke out on a matter of public concern in June 2004, when he informed Superintendent Herrick that the teachers' union would not honor his unilateral directive that union representatives could no longer accompany teachers to meetings with the administration.

23.     In the Fall of 2004, acting in his capacity as president of the teachers' union, Mr. Zellner again spoke out publicly on a matter of public concern when Mr. Ben Siebert, the high school basketball coach, was forced to resign under circumstances where, because Superintendent Herrick and the School Board knew that there were no grounds to terminate him for cause, Coach Siebert's request for a public hearing was denied.

24.     As a result of Mr. Zellner's having spoken out on this matter of public concern, exposing the circumstances related to the termination of Coach Siebert's employment, community members forced a recall election and two members of the School Board were removed. But for the fact that Board President. Pendergast and other board members had been in office for less than one year, they too could have been removed from office.

25.     In his capacity as president of the teachers' union, Mr. Zellner again spoke out regarding a matter of public concern in December 2004, objecting publicly when Superintendent Herrick and the School Board created a "task force" utilizing a third-party mediator to address issues relating to Cedarburg High School, but refused to allow the principal or vice principal of the high school to participate; prevented Mr. Zellner and other volunteer teachers from participating; and allowed only four teachers selected by Superintendent Herrick to participate, thereby causing the third-party mediator to resign because he could not work with the task force selected by Superintendent Herrick and the School Board.

7

26.. In January 2005, in his capacity as president of the teachers' union, Mr. Zellner initiated a "no confidence" vote by the membership of the teacher's union as it related to Superintendent Herrick's ability to lead the School District, and more than 95% of those teachers who participated voted "no confidence" in Superintendent Herrick.

27. In his capacity as president of the teachers' union, Mr. Zellner caused the results of the teacher's vote of "no confidence" to be published in the local newspaper, and he held two press conferences to respond to questions on the subject of the teachers' resounding vote of "no confidence" in Superintendent Herrick's ability to lead the School District.

28. Before classes began for the 2005-2006 school year, the School Board directed that Superintendent Herrick issue a new computer usage policy for the School District and that teachers and staff should be provided specific training regarding that policy. The new computer usage policy made no reference to termination as a consequence of any violation thereof; no training was provided to teachers or staff regarding this new policy; and there was no indication given to Mr. Zellner or other teachers and staff that Google image searches conducted by teachers for the purpose of screening material would henceforth be deemed a violation of the new computer usage policy.

29. At the express direction of Superintendent Herrick, sometime before classes began for the 2005-2006 school year, District IT Director Borkenhagen caused special software to be secretly installed on the school district computer used by Mr. Zellner for the express purpose of monitoring his use thereof.

30. By that time, IT Director Borkenhagen had received a number of complaints from teachers relating to unwanted "pop-up" materials that were appearing on school district computers used by teachers and students throughout the school district. Specifically, her IT

8

Department received sixty-two (62) work orders to fix those problems, including seven work orders involving unwanted adult pop-ups. While the school district computers of several teachers and an administrator were reimaged two or more times, Mr. Zellner's school district computer was singled out as the only one to have monitoring software installed on it without his knowledge. Neither Mr. Zellner nor his immediate supervisor, the high school principal (Mr. Grieger) were informed of this action.

31.     When Fall 2005 classes commenced, Mr. Zellner did not complain to IT Department personnel that his school district computer had a "pop up" problem. He did, however, report that his school district computer was "slow", and he was instructed by Mrs. Dries, an IT Department employee, to put in a request to have it "re-imaged". Mr. Zellner did so, his school district computer was "re-imaged", and its speed improved once that process was completed.

32.     Over the course of several summers, Mr. Zellner organized and led annual school-sponsored "marine biology" courses in Hawaii, whose student participants received high school credit. During the course of those trips, with the permission of the student-participants shown thereon, Mr. Zellner regularly posted digital photographs on a website of the student-participants and their activities that were taken by him and by student participants themselves, so that parents and others could access them and stay informed

33.     From time to time over a period of several years, student participants asked Mr. Zellner to use his school district computer to view digital photographs taken by them that were contained on CDs owned by them. On those occasions, in the presence of the student participant(s), Mr. Zellner would use his school district computer to view those digital photographs and then return to its owner the CD that contained them.

9

34.    As confirmed by the data on the hard-drive for his school district computer, Mr. Zellner never "saved" any of those digital photographs; nor could he access or view any of them using his school district computer once the CDs that contained them were removed from his school district computer and returned to the student participants as described.

35.    Following the Summer 2005 trip, as in prior years, Mr. Zellner was working in collaboration with two student-participants, to create a CD for parents and student-participants that used digital photographs taken by him and by student-participants to chronicle the most recent Hawaii trip. The CD was completed by the student participants subsequent to the termination of Mr. Zellner's employment.

36.    On Sunday, November 6, 2005, while Mr. Zellner was at the high school preparing his lesson plans and power point presentations, he used his school district computer to access the Google image search engine for a total of three hours.

37.    During that three hour period, Mr. Zellner intentionally checked to see whether the School District had finally installed commercially available software that would block access to adult materials for those who used school district computers; or whether, as before, students who used the Google image search engine on school district computers to prepare power point presentations for his class would still be able to access adult websites by merely turning off the filters with a couple of clicks.

38.    For a total of 67 seconds, commencing at 8:47:35 p.m., Mr. Zellner turned off the filters on the Google image search engine available on his School District computer. Twelve seconds after he turned off the filters, at 8:47:47 p.m., Mr. Zellner typed the search term "blonde". For the next 20 seconds, until 8:48:07 p.m., the first page of unfiltered Google image search results, which identified approximately 20 websites, each with a small photograph, was displayed on his

10

computer monitor. The second page of unfiltered Google image search results, which identified another 20 websites, was displayed on his computer monitor for the next 25 seconds. Then, at 8:48:32 p.m., Mr. Zellner clicked on to a button entitled "more of these" whicht was located below a website address identified on that page of unfiltered Google image search results as entitled www.ardentes.free.frblonde.com. While approximately 20 small search result images of a blonde woman were displayed on his computer monitor, Mr. Zellner never opened that wbsite itself. Instead, seventeen seconds later, at 8:48:49 p.m., he returned to the second page of his Google image search results; three seconds thereafter, at 8:48:52 p.m., he returned to the first page of his Google image search results; and within two seconds after that (8:48:54 p.m.), Mr. Zellner left the Google image search engine.

39.     The data contained on the hard-drive of Mr. Zellner's school district computer established that he did not open any of the websites identified on the two pages of unfiltered Google image search results obtained using the search term "blonde", including the www.ardentes.free.flblonde.com website.

40.     The data contained on Mr. Zellner's school district computer established that all other Google image searches that Mr. Zellner made on that date were science-related, involving search words such as "planets", "plants", and "macro-invertebrates".

41.     Sometime after November 6, 2005, IT Director Borkenhagen reviewed the data captured by the monitoring software installed on the school district computer used by Mr. Zellner, showing the usage described above; and she reported her "findings" to Superintendent Herrick, who promptly involved School Board President Pendergast and James Korom, the legal counsel for the School District, to discuss how this information could be used against Mr. Zellner to force

11

him from his teaching position and to "send a message" to the teachers and their union that those who dared to challenge the School Board or School District administrators would be destroyed.

42.    The above-named defendants knew or had reason to know from the data captured by the monitoring software on Mr. Zellner's school district computer, and on the hard-drive for that computer, that he did not open any adult website, and that no digital photographs of students from his Hawaii trip were inappropriately saved to that computer.

43.    The defendants also knew or had reason to know that the conduct engaged in by Mr. Zellner did not constitute "just cause" for termination of his employment under the terms of the School Districts collective bargaining agreement with the teachers' union.

44.    Despite this, acting in bad faith and with malice for the express purpose of retaliating against Mr. Zellner for having repeatedly spoken out against the School Board and School District Administrators on matters of public concern, those defendants determined to "go public" and to falsely portray Mr. Zellner as someone who was a danger to the children in the School District, thereby so damaging him in his reputation and profession that he would be forced out of his teaching position.

45.    To this end, those defendants consciously determined to disregard the School District's standard operating procedures for disciplining teachers, pursuant to which the high school principal was to provide verbal, then written, warnings to a teacher before any disciplinary action was taken, in all likelihood because the high school principal was never informed that Mr. Zellner's school district computer was secretly monitored; nor was the high school principal ever told that termination was the punishment for violation of the School District's computer policy.

46.    Instead, acting together, the defendants chose to confront Mr. Zellner directly with a false and disingenuous ultimatum.

12

47.     On December 20, 2005, Superintendent Herrick and the School District's legal counsel, James Korom, summoned Mr. Zellner for a meeting at Herrick's office to discuss his "termination".

48.     Accompanied by teachers' union representative Patrick Connolly, Mr. Zellner met that day with Superintendent Herrick and Attorney Korum.

49.     At that meeting, Mr. Zellner acknowledged that on a Sunday evening several weeks earlier he had used his school district computer to conduct an unfiltered Google image search using the search term "blondes" and had briefly looked at Google image search results.

50.     In the presence of Mr. Connolly and Superintendent Herrick, Attorney Korom demanded that Mr. Zellner "Resign or we'll go public with this. We don't want you here." Attorney Korom also threatened Mr. Zellner, stating that he should resign "to minimize the impact of your behavior on your family and on your personal reputation"; and that, if Mr. Zellner did not resign, "we [Superintendent Herrick, School District Attorney Korom and the School Board] will 'go public' and initiate public proceedings to terminate [him] for cause."

51.     When Mr. Zellner offered to sign a "last chance" agreement, his proposal was rejected; when he offered to finish out the current school year before leaving, that proposal was also rejected; and when he offered to resign at that point, provided, however that he would be paid liquidated damages in the amount of $20,000 if the defendants were to "go public", that proposal was rejected as well.

52.     Based upon the foregoing, Mr. Zellner reasonably concluded at that point that the defendants intended to "go Public" and to destroy his reputation and profession whether or not he resigned.

13

53.     On January 8, 2006, Mr. Zellner informed Superintendent Herrick of his decision not to resign from his employment. Although Superintendent Herrick represented to Mr. Zellner that the decision whether to terminate him was "for the School Board to make", and that he had "no say in the matter", Superintendent Herrick caused false "Charges Supporting Discharge from Employment of Robert Zellner" (the "charging document") to be submitted to the Cedarburg School Board.

54.     Without basis, Superintendent Herrick's charging document asserted that Mr. Zellner "reviewed images on that [www.ardentes.free.frblonde.com] pornographic website"; and that "the images [that Mr. Zellner] reviewed contain graphic sexual photographs depicting, among other things, female masturbation, male/female mutual masturbation, female/female oral sex, male/female oral sex, a female performing oral sex on multiple males simultaneously, hermaphrodites, simulated intercourse with various objects, male/female intercourse, and spanking."

55.     The charging document falsely asserted that Mr. Zellner used his school district computer to open the www.ardentes.free.frblonde.com website, when in fact he never did so. While Mr. Zellner admitted that he saw the small images displayed on the two pages of Google image search results, he never admitted that he accessed any of the websites identified on those two pages of Google image search results. In fact, the evidence available on the hard drive for the school district computer used by Mr. Zellner established that he never accessed any of the websites that were described so graphically by Superintendent Herrick in the charging document.

56.     Neither the monitoring data that defendant Borkenhagen provided to Superintendent Herrick and Attorney Korom, or the hard-drive on Mr. Zellner's school district computer, show that he opened that website or any other adult website. Rather, they show that Mr. Zellner

14

merely clicked on the "more of these" message displayed beneath the www.ardentes.free.frblonde.com website address, and that for 17 seconds the Google image search result for that website address, but not the website itself, was displayed.

57. The charging document also falsely asserted that Mr. Zellner admitted that (i) "he has conducted similar searches, with different search terms, on multiple occasions during the 2005-2006 school year, seeking to, and successfully viewing, other pornographic images on those occasions"; (ii) "These searches have occurred both on weekends and on school days after students are dismissed"; and (iii) "Mr. Zellner acknowledged his actions were in violation of District policies and legitimate expectations."

58. Mr. Zellner made none of the statements attributed to him; and, significantly, both computer forensics experts initially hired by the school district to examine the hard drive on Mr. Zellner's school district computer found no evidence of any such searches. In addition, based upon the data contained on the hard-drive of Mr. Zellner's school district computer, a third IT forensic specialist engaged by the School District, found no evidence that Mr. Zellner ever opened an adult website. That same IT forensic expert also agreed that pop-ups of adult images can appear unsolicited and spontaneously without a computer user having attempted to access them; and that on November 6, 2005, Mr. Zellner never used his school district computer to open any adult website, let alone the ones so graphically described in the charging document.

59. The charging document also falsely stated that illicit or inappropriate images were stored on Mr. Zellner's school district computer. Specifically, the charging document stated that "Zellner had retained photographs of female students of the District wearing bikinis while on a school-sponsored trip to Hawaii, chaperoned by Mr. Zellner."

15

60.     By doing so, the charging document falsely suggested that Mr. Zellner had somehow engaged in inappropriate conduct relative to his students; when, in fact, the data from the hard-drive on Mr. Zellner's school district computer established that he had not "saved" to that computer any inappropriate digital photographs from the trips to Hawaii.

61.     Moreover, the charging document falsely implied that the digital photographs contained on the CDs owned by the student participants who had taken them were sexually suggestive in nature.   To the contrary, the defendants knew or should have known that every student-participant whose photograph was taken by Mr. Zellner approved that digital photograph; all such photographs were made available to student-participants and their parents; many of them were posted on the website described earlier, that was available to parents and others; Mr. Zellner had informed the parents of student-participants in advance that the digital photographs would be taken to document the trip; and a number of the photographs were published in the high school yearbook.

62.     Moreover, the defendants knew or should have known that no student, male or female, ever complained that Mr. Zellner made them feel uncomfortable in any way; and every female student who spoke at the public termination hearing described herein noted his exceptional teaching skills and his exemplary personal demeanor.

63.     Mr. Zellner repeatedly requested that the termination hearing conducted by the School Board to address the charges contained in the charging document should be conducted in closed session.  However, Superintendent Herrick, School Board President Pendergast and the School District's legal counsel, Attorney Korom, insisted that Mr. Zellner's termination hearing should be conducted as a public hearing. By doing so, they acted maliciously and willfully, with knowledge or with reason to know that (i) the charges contained in the charging document were

16

false; and (ii) there was no basis to terminate Mr. Zellner for cause, for the express purpose of irreparably damaging Mr. Zellner in his reputation and profession, thereby forcing him to resign and precluding him from future employment in his chosen profession., all in retaliation against him for having repeatedly spoken out against Superintendent Herrick and the members of the School Board regarding matters of public concern.

64. On January 17, 2006, the School Board conducted a highly publicized public hearing on the charges set forth in the charging document. At that public hearing, Superintendent Herrick and Attorney Korom made public statements about Mr. Zellner that were intentionally misleading, false, defamatory and slanderous. At the public hearing, Superintendent Herrick falsely stated that Mr. Zellner admitted to having viewed pornography at school on "multiple occasions" during the 2005-2006 school year; and Attorney Korom stated that "This is nothing short of hardcore pornography. And calling it adult-oriented materials does not accurately describe the content of the materials that you [the School Board members] are about to see tonight." At the public hearing, Attorney Korom also falsely stated that "There's been a suggestion this happened on one occasion only. It is absolutely not true. Mr. Zellner himself admitted that he did this on multiple occasions." At the public hearing, Superintendent Herrick also falsely stated that Mr. Zellner "admitted doing similar searches with 'blonde' and successfully accessed websites and viewed pornography."

65. During the course of the deliberations by the School Board in closed session, the defendants caused the members of the School Board to be shown a copy of the page from the Google image search results that identified the "ardentes.free.frblondes" website; but they were not told that Mr. Zellner never opened that website or any other website identified on that

Case 2:08-cv-00315-RTR   Filed 04/16/08   Page 17 of 23   Document 1

Google image search results and verbally listed by Attorney Korom during the course of the public hearing.

66.     When the School Board reconvened in open session, its members voted unanimously to terminate Mr. Zellner; and Board President Pendergast presented a prepared press release to the media which stated that "The Cedarburg School Board believes strongly that accessing porn at any time or by anyone has no place in our District and cannot and will not be tolerated."

67.     Immediately following that public hearing, Board President Pendergast made additional false, defamatory and malicious statements to the media about Mr. Zellner, asserting that it would be "dangerous" to allow him to teach teenagers.

68.     On January 21, 2006, *The Milwaukee Journal Sentinel published* in an article entitled "This Time, Cedarburg Board Got It Right", which attributed the following false, defamatory and malicious statement to Attorney Korom: "Zellner was caught accessing hardcore porn sites called 'pervert pics', 'all-lesbian teens', and 'all sexy teenz'".

69.     Mr. Zellner timely appealed from the School Board's decision to terminate his employment; and the School Board affirmed its decision.

70.     Thereafter, Mr. Zellner invoked his right under the collective bargaining agreement with the School District to have the issue of "cause" for termination adjudicated in binding arbitration.

71.     On the basis of a record comprised of three days of testimony and scores of exhibits, the arbitrator issued his decision on September 13, 2006, finding that Mr. Zellner was terminated without "cause", ordering the School District to reinstate him immediately; and awarding to him all back pay and benefits from the date of his termination, plus interest.

72.    The School District appealed the arbitrator's decision in bad faith, under circumstances where it knew or should have known that there existed no legal or factual basis for such an appeal.

73.    To gain public support for the decision to appeal from the arbitrator's decision, some or all of the defendants caused the School Board to conduct a much publicized public hearing at which a number of parents of School District students, based upon the defendants' continuing false and defamatory statements against Mr. Zellner, expressed public outrage at the prospect of Mr. Zellner's reinstatement.

74.    The false and defamatory public statements about Mr. Zellner that defendants continued to make following the arbitration decision included the following:

(i) On September 15, 2006, in an article entitled "Taking Stock of Teachers' Web Links", *The Milwaukee Journal Sentinel* attributed the following false and defamatory statement to Attorney Korom: "Zellner accessed 'hardcore' porn sites repeatedly at school" and "...most bothersome is that he viewed porn at school...and had many pictures of female students in bikinis on his computer."

(ii) On March 29, 2007,   a full-page advertisement published in *The News Graphic* supporting the reelection of certain School Board members, including Board President Pendergast, stated: "Our mission: to safeguard students against irresponsible and predatory individuals".    That ad also listed a number of the candidates' achievements, including: "Demonstrated zero tolerance for teachers found to have used District resources to access pornography...Teachers' Union filed legal action...firing remains in effect...your vote will continue the fight!"

19

(iii) On June 17, 2007, in an article entitled "Firing Has Been Costly; Effort to Oust Cedarburg Teacher Tops", *The Milwaukee Journal Sentinel* attributed the following false and malicious statement to Board President Pendergast: "At what price do you decide to put someone who views pornography back in school?"

75.     As a direct and proximate result of the willful and malicious conduct of the defendants, all under color of state law, Mr. Zellner has been embarrassed, humiliated, damaged in his reputation and profession, suffered economic loss, lost his employment with the Cedarburg School District, lost any prospective employment in his profession that is commensurate with his education, experience and salary history, and suffered the loss of enjoyment of life.

76.     Despite all reasonable efforts, to date Mr. Zellner has been unable to secure employment in his profession.

77.     At age 42, Mr. Zellner's remaining actuarial life is 40 years; and but for the wrongful conduct of the defendants, he intended to remain actively employed in his chosen profession for a minimum of twenty (20) additional years.

78.     The present value of Mr. Zellner's lost wages, including benefits, for that period of time is no less than $1.5 million.

79.     The amount required to compensate Mr. Zellner for the damage to his reputation and standing in his profession and in the community, mental distress and anguish, humiliation, embarrassment and loss of enjoyment of life that he continues to endure as a direct and proximate result of the wrongful, willful and malicious conduct of defendants exceeds $2 million.

80. In addition, by virtue of the malicious and willful conduct of the defendants, Mr. Zellner is entitled to recover punitive damages in excess of $2 million.

20

### FIRST CAUSE OF ACTION: FOR RETALIATION AGAINST ZELLNER FOR EXCERCISING HIS FIRST AMENDMENT RIGHT TO SPEAK OUT REGARDING MATTERS OF PUBLIC CONCERN

81.     Mr. Zellner repeats and re-alleges the allegations contained in paragraphs 1 through 80 above, inclusive.

82.     Defendants, jointly and severally, engaged in the conduct described above under color of state law, with malice, for the express purpose of retaliating against Mr. Zellner for speaking out regarding a number of matters of public concern and to force him from his position as a teacher at Cedarburg High School.

83.     As a direct and proximate result of the willful and malicious actions of defendants, jointly and severally, all under color of state law, Mr. Zellner suffered economic loss, loss of employment, damage to his reputation and profession, mental anguish, emotional pain and suffering, and loss of enjoyment of life.

84.     Accordingly, Mr. Zellner is entitled to a judgment on this claim against defendants, jointly and severally, for compensatory damages in an amount in excess of $2.5 million, for punitive damages in an amount in excess of $2 million, and for his attorney fees and costs.

### SECOND CAUSE OF ACTION: FOR DEPRIVATION OF ZELLNER'S FIFTH AMENDMENT LIBERTY INTEREST WITHOUT DUE PROCESS

85.     Mr. Zellner repeats and re-alleges the allegations contained in paragraphs 1 through 84, above, inclusive.

86.     Defendants engaged in the conduct described herein for the express purpose of illegally and improperly forcing Mr. Zellner from his employment.

87.     As a direct and proximate result of the willful and malicious conduct of defendants (i) Mr. Zellner lost his employment; (ii) his reputation has been so impugned as to seriously damage

Case 2:08-cv-00315-RTR   Filed 04/16/08   Page 21 of 23   Document 1

his standing and associations in his profession; (iii) his freedom to take advantage of employment opportunities commensurate with his education, experience and salary history has been foreclosed, effectively precluding him from continuing in his chosen career.

88.     As a result of the actions of defendants, and the resultant press coverage which is also available on the internet to those prospective employers who do simple background checks on prospective employees using internet search engines such as "Google", Mr. Zellner has lost the positions for which he has applied that are commensurate with his education, experience and salary history.

89.     As a result of the willful and malicious actions of defendants, all under color of state law, without due process Mr. Zellner was deprived of his Fifth Amendment liberty interest and has suffered loss of freedom, mental anguish, emotional pain and suffering, and loss of enjoyment of life.

90.     Accordingly, Mr. Zellner is entitled to a judgment on this claim against defendants, jointly and severally, for compensatory damages in an amount in excess of $2.5 million, for punitive damages in an amount in excess of $2 million, and for his attorney fees and costs.

WHEREFORE, plaintiff Robert A. Zellner prays for judgment against defendants, jointly and severally, as follows:

1. As to the First Claim, a money judgment against defendants, jointly and severally, for compensatory damages in an amount in excess of $2.5 million and for punitive damages in an amount in excess of $2 million, together his attorney fees and costs pursuant to 42 U.S.C §1983.

22

2. As to the Second Claim, a money judgment against defendants, jointly and severally, for compensatory damages in an amount in excess of $2.5 million and for punitive damages in an amount in excess of $2 million, together with attorney fees and costs pursuant to 42 U.S.C. § 1983.

3. For such other and further relief as this Court may deem just and equitable.

Dated: April 16th, 2008.

Michael P. Erhard
Wisconsin State Bar No. 1015393
*Attorney for Plaintiff*

Of Counsel:

ERHARD & PAYETTE, LLC
Excelsior Financial Center
8010 Excelsior Drive, Suite 200
Madison, WI 53717
Direct Line: 608.692.3298
Fax: 608.237.6323