# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

ROBERT ZELLNER,

                    Plaintiff,

      v.                                     Case No. 08-C-0315

DARYL HERRICK,
JOHN PENDERGAST,
JAMES R. KOROM,
LINDA BORKENHAGEN, and
CEDARBURG SCHOOL DISTRICT,

                    Individual Defendants,

and

ALLSTATE INSURANCE COMPANY,

                    Intervenor-Defendant.

---

## DECISION AND ORDER

---

        Plaintiff Robert Zellner ("Zellner"), filed a civil rights complaint under 42 U.S.C. § 1983 against Defendants Daryl Herrick ("Herrick"), John Pendergast ("Pendergast"), James R. Korom ("Korom"), Linda Borkenhagen ("Borkenhagen"), and the Cedarburg School District ("District"), (collectively the "Defendants"). Zellner's complaint alleges that the Defendants violated his civil rights based on the District's termination of his employment as a biology teacher at the Cedarburg High School ("high school") for cause after it was discovered that he had viewed pornographic images on his school computer.

Herrick, Pendergast, Korom, and Borkenhagen (collectively the "Individual Defendants") are named in their individual and official capacities. The introductory paragraph of Zellner's complaint states that he brings the action for retaliation against him for exercising his First Amendment rights, for deprivation of his Fifth Amendment liberty interest without due process, and for conspiracy to violate his civil rights. However, the complaint only contains two causes of action: a First Amendment retaliation claim (first cause of action) and a Fifth Amendment deprivation of liberty interest without due process claim (second cause of action).[1]

Currently pending are the Defendants' motion to dismiss (Docket No. 8), Herrick's motion to dismiss (Docket No. 11),[2] and Intervenor-Defendant Allstate Insurance Company's ("Allstate") motion to intervene, bifurcate, and stay this action (Docket No. 21). The motions are ready for resolution and are addressed herein.

*Motion to Dismiss*

Relying on Federal Rule of Civil Procedure 12(b)(6), the Defendants seek dismissal of the action on the grounds that Zellner's claims are barred by claim preclusion and the *Rooker-Feldman* doctrine and, therefore, his complaint fails to state a cause of action upon which relief can be granted. Alternatively, the Individual Defendants assert that

---

[1]Zellner's deprivation of liberty interest without due process claim should have been brought under the Fourteenth Amendment which provides "nor shall any State deprive any person of life, liberty, or property, without due process of law." *See, e.g., Ulichny v. Merton Cmty. Sch. Dis.*, 249 F.3d 686, 704-05 (7th Cir. 2001). The Court has analyzed that claim as if Zellner had relied upon the Fourteenth Amendment.

[2]Herrick's motion to dismiss adopts the facts and arguments in the Defendants' motion to dismiss.

Zellner's claims against them in their individual capacities should be dismissed because they are barred by qualified immunity.

Zellner asserts that his claims are not barred by claim preclusion relying on *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974). He also asserts that public policy precludes mandatory arbitration of civil rights claims. Further, he contends that the Individual Defendants are not entitled to qualified immunity with respect to any of his claims.

*Standards of Review*

The Defendants' reliance on the *Rooker-Feldman* doctrine presents the threshold issue of whether the Court lacks subject matter jurisdiction. Motions seeking dismissal for lack of subject matter jurisdiction are made pursuant to Rule 12(b)(1). *See Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 553-54 (7th Cir. 1999).

When considering a motion to dismiss for lack of subject matter jurisdiction, this Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *See Long*, 182 F.3d at 554. "The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (Citations omitted).

A motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests whether a complaint states a claim upon which relief may be granted. *General. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). A plaintiff must provide only "enough detail to give the defendant fair notice of what the claim is and

the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008). (Citations omitted). When considering a motion to dismiss, the Court works under "the assumption that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007).

The Defendants and Zellner have submitted matters outside the pleadings with their briefs, but do not address the procedural import of the filing of those documents. Rule 12(d) provides that if matters outside the pleadings are presented to and not excluded by the court in a Rule 12(b)(6) motion, the motion "must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

The Defendants have filed Wisconsin Circuit Court Access ("WCCA") records, Wisconsin Supreme Court and Court of Appeals Access records, written opinions of the Wisconsin Supreme Court and Court of Appeals, and the September 14, 2006, arbitration decision in *Cedarburg School District and Cedarburg Education Association*, FMCS Case No. 06-02483 ("arbitration decision"). With their reply brief, the Defendants have also filed a copy of the complaint in the Ozaukee County Circuit Court action, *Cedarburg Education Association v. Cedarburg Board of Education*, No. 06-CV-501 ("06-CV-501 action"), a two-page excerpt from the Cedarburg Education Association's ("Union's") brief in the 06-CV-501 action, the Ozaukee County Circuit Court's March 29, 2007, opinion in 06-CV-501 action, and the cover page and the final page of the Union's brief in the subsequent appeal

4

from that determination, *Cedarburg Education Association v. Cedarburg Board of Education*, 2007 AP 000852 ("2007AP852 appeal").

Zellner filed the affidavit of Michael P. Erhard ("Erhard") which contains a brief excerpt from the collective bargaining agreement ("CBA") that was in effect during the 2005-06 school year. The excerpt defines a grievance.

The parties also filed a July 29, 2008, letter from Christopher P. Riordan ("Riordan") and an August 28, 2008, letter from Erhard conveying additional documents that were filed in the 2007AP852 appeal.

The Court may take judicial notice of matters of public record without converting a Rule 12(b)(6) motion into a motion for summary judgment. *Menominee Indian Tribe of Wis. v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); *Gen. Elec. Capital Corp.*, 128 F.3d at 1080-1081; *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994); 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, Civil 2d § 1364 at 140-41 (3d ed. 2004). Rule 201 of the Federal Rules of Evidence governs judicial notice of adjudicative facts. *See* Fed. R. Evid 201(a). Rule 201(b) states that "[ a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

Because the accuracy of the state court dockets, decisions, documents filed in those actions cannot reasonably be questioned, the Court will take judicial notice of the timing of and the fact that those actions, decisions, and briefs were filed. *See Gen. Elec.*

*Capital Corp.*, 128 F.3d at 1081. The Court will take judicial notice of the fact that parties made the statements they made in those documents, but the Court will not assume the truth of those statements or take judicial notice of the facts asserted in those pleadings. *See id.* at 1081-82.

The Defendants also filed the arbitration decision. The legal authority that the Court has found on the issue whether an arbitration decision is subject to judicial notice is limited, *see Green Tree Fin. Corp. v. Honeywood Dev. Corp.*, No. 98-C-2332, 2001 WL 62603 *3 n.4 (Jan. 24, 2001), and does not persuade the Court that the arbitration decision falls within the scope of matters that are subject to judicial notice. Therefore, the Court has excluded that arbitration decision from the consideration of the 12(b)(6) grounds raised by the Defendants' motion.

The Court has also excluded the CBA excerpt from consideration of the Rule 12(b)(6) grounds raised by the Defendants. A contract that is attached to a complaint or is central to a complaint may be considered without converting a 12(b)(6) motion to summary judgment motion. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). The CBA excerpt is not attached to Zellner's complaint or central to the complaint.

*Complaint*

Zellner was employed as a biology teacher at the high school beginning in the 1995-96 school year. Prior to the termination of his employment, Zellner had an unblemished record. He had positive evaluations stressing that his job knowledge was excellent, he freely

6

shared his time with students and colleagues, and his teaching style was creative, motivated, and engaging.

Zellner was an active member of the teacher's Union. He served as its representative and negotiator for during the 2002-03 school year and as its president for during the 2003-04, and 2004-05 school years. Because of Zellner's union positions and activity, he was in conflict with Herrick, the District superintendent, on numerous occasions.

In April 2003, Herrick unsuccessfully attempted to terminate the employment of the high school principal. In his capacity as Union representative, Zellner spoke out against Herrick and the School Board on this matter of public concern. On May 22, 2003, Zellner and 57 other high school staff members, published a half-page statement in the Ozaukee County News Graphic detailing Herrick's discredited testimony against the principal, and stating that Herrick and the District had created "an atmosphere of uncertainty, distrust and intimidation between the district administration" and the high school staff by pursuing an unwarranted case against the principal, using taxpayer money for attorneys fees and additional school resources to pursue the case, and damaging the excellent reputation of the high school. (Compl. ¶ 13.)

During the same time period, Zellner received a report from one of his astronomy students that, while using a District computer for an assignment and turning off the filter, the results of his "Google image search" included a number of adult web sites. Zellner reported the incident to information technology personnel and inquired if the District could install any commercially available software to block inappropriate material from being

7

accessed on school district computers ("blocking software"). Zellner was informed that Borkenhagen's position was that such software would limit student access to information and, as a result, no blocking software had been installed on the computers. The information technology staff told Zellner to instruct his students to inform him of any inappropriate material they found while conducting "Google image searches," and that he should pass that information on to them.

Borkenhagen instructed Zellner and all District teachers, trained to use computers, to screen websites before using them with students. Information technology personnel assured Zellner that it was permissible for him to use his District computer to conduct Google image searches for screening purposes and he was expected to conduct them from time to time.

In November 2003, in his capacity as Union president, Zellner refused to agree to the refinancing of an unfunded liability proposed by Herrick because it would jeopardize the teachers' benefits if a qualified economic offer was implemented. Thereafter, following a particularly acrimonious budget meeting in December 2003, an "angered" Herrick informed Zellner, "'as a courtesy,'" that a "'prominent'" but unnamed member of the community had claimed, months earlier, that Zellner was "'into pornography'" but that "'it had nothing to do with [Zellner's] employment.'" (Compl. ¶ 18.) Herrick told Zellner that the "gloves would come off." (Compl. ¶ 18.) Zellner construed Herrick's comments as a veiled threat to cause rumors to be spread against Zellner in retaliation for his refusal to agree to the proposed

refinancing of the unfunded liability and because he had repeatedly spoken out against Herrick.

Later in December 2003, acting on behalf of the Union's executive committee, Zellner presented a survey to the Union membership relating to the job performance of each of the District administrators, including the principals, vice principals, superintendent, and information technology and finance directors. When Zellner attempted to present the survey results to the School Board at a closed session meeting, Herrick directed the School Board members not to open their copies of the survey results and they complied. A follow-up letter was sent to the School Board members asking them to consider the survey results, without success.

In the spring of 2004, Zellner disabled the filter on his District computer to determine whether the District had caused blocking software to be installed. Zellner conducted a "Google image search" using the search term "Venus" and obtained search results that included adult website addresses. Zellner reported his finding to the District information technology department. Again, he was told that no blocking software would be installed on District computers and that, prior to assigning Google image searches, he should continue to instruct students to inform him if they obtained any inappropriate images in their search results.

In June 2004, in his capacity as Union president, Zellner informed Herrick that the Union would not honor Herrick's unilateral directive that Union representatives could no longer accompany teachers to meetings with the administration.

In the fall of 2004, in his capacity as Union president, Zellner spoke out publically when Ben Siebert ("Siebert"), the high school basketball coach, was forced to resign under circumstances where Herrick and the School Board knew grounds did not exist to terminate Siebert's employment for cause and, therefore, Siebert's request for a public hearing was denied. At a result of Zellner's speaking out on the matter exposing the circumstances of Siebert's resignation, community members forced a recall election and two School Board members were removed. Pendergast and other board members could have been subject to removal from office, but for the fact that they had been in the office for less than one year.

In December 2004, in his capacity as Union president, Zellner objected publically when Herrick and the School Board created a task force using a third-party mediator to address issues relating to the high school, refused to allow the high school vice principal and principal to participate, prevented Zellner and other volunteer teachers from participating, and allowed only four teachers selected by Herrick to participate. The third-party mediator resigned because he could not work with the task force selected by Herrick and the School Board.

In January of 2005, Zellner, in his capacity of Union president, initiated a no-confidence vote by the Union membership as it related to Herrick's ability to lead the District and more than 95% of participating teachers voted "no confidence." In his capacity as Union president, Zellner caused the results to be published in the local newspaper and held two press

10

conferences to respond to questions on the subject of Herrick's ability to lead the School District.

Before the 2005-06 school year classes began, the School Board directed that Herrick issue a new computer usage policy and that teachers and staff be trained regarding that policy. The new computer usage policy made no reference to termination as a consequence of a violation of that policy, no training was provided regarding the new policy, and no indication was given to Zellner or other teachers or staff that conducting Google image searches to screen material would be deemed a violation of the new policy.

During that same time period, at the express direction of Herrick, Borkenhagen caused special software to be secretly installed on Zellner's computer to monitor his computer usage. Zellner's computer was the only one in the District on which the special software was installed and neither Zellner nor the high school principal were informed it had been installed.

On Sunday, November 6, 2005, while Zellner was at the high school preparing his lesson plans and power point presentations, he used his District computer to access the Google search image engine for three hours and checked whether the District had installed blocking software on the computers. For a total of 67 seconds, commencing at 8:47:35 p.m., Zellner turned off the filters on the Google image search engine, typed the search term "'blonde,'"[3] and obtained a page with about 20 websites. (Compl. ¶ 38.) Each of those websites depicted a small photograph of a blonde woman. He also obtained a second page

---

[3]The Complaint uses the terms "blonde" and "blondes" to describe Zellner's search on November 6, 2005. (*Compare* Compl. ¶¶ 38 and 64, with ¶ 49.)

with about 20 websites. Then, Zellner clicked on a button entitled "more of these," located below a website address entitled www.ardentes.free.frblondes.com and about 20 small search result images of a blonde woman were displayed. At 8:48:54 p.m, Zellner exited the Google image search engine. The data contained on Zellner's District computer confirmed he had not opened any of the websites obtained using the search term "blonde," and that all the other searches he had conducted that evening were science-related. (Compl. ¶ 39.)

Sometime after November 6, 2005, Borkenhagen, reviewed the data captured by the monitoring software on Zellner's computer, showing Zellner's computer usage on November 6, 2005. Borkenhagen conveyed her findings to Herrick.

Thereafter, Herrick involved Pendergast and Korom, to discuss how the information could be used to force Zellner from his teaching position and to "'send a message'" to the teachers and the Union that those who challenged the School Board or District administrators "would be destroyed." (Compl. ¶ 41.) The Individual Defendants disregarded the District's standard procedures for disciplining teachers; i.e.,that the high school principal would provide verbal, then written, warnings, before any disciplinary action was taken.

On December 20, 2005, instead of following standard procedures, Herrick and Korom directed Zellner to attend a meeting in Herrick's office to discuss the termination of Zellner's employment. Zellner, accompanied by Union representative, Patrick Connolly, met with them that day. Zellner acknowledged that several weeks earlier he had used his District

computer to conduct an unfiltered Google image search using the search term "'blondes'" and had briefly looked at the results. (Compl. ¶ 49.) Korom demanded that Zellner resign or that the District would go public and initiate public proceedings to remove Zellner for cause. Korom also stated: "'We don't want you here,'" and told Zellner to resign to minimize the impact of his behavior on his family and personal reputation. (Compl. ¶ 50.) Zellner offered to sign a last chance agreement, to finish the current school year before leaving and to resign then with the payment of $20,000 as liquidated damages if the Defendants went public – each of Zellner's offers were rejected.

On January 8, 2006, Zellner informed Herrick that he decided not to resign. Sometime thereafter, Herrick caused a charging document to be submitted to the School Board, that contained false representations about Zellner's conduct and reported admissions that had not been made by Zellner.

Zellner repeatedly requested that the termination hearing be conducted by the School Board in closed session. However, the Individual Defendants insisted that the hearing be a public hearing.

On January 17, 2006, the School Board conducted a highly publicized public hearing on the charges. During the public hearing, Herrick falsely stated that Zellner admitted having viewed pornography on multiple occasions during the 2005-06 school year and that Zellner "'admitted doing similar searches with 'blonde' and successfully accessed websites and viewed pornography.'" (Compl. ¶ 64.)

13

During the public hearing, Korom stated that "'[t]his is nothing short of hardcore pornography and that calling it adult oriented does not accurately describe the content of the materials you [School Board members] are about to see tonight.'" (Compl. ¶ 64.) Korom also falsely stated that the suggestion that Zellner only accessed pornography once was not true, and that Zellner "'admitted that he did this on multiple occasions.'" (Compl. ¶ 64.)

During closed session deliberations by the School Board, the Defendants caused the members of the School Board to be shown the copy of the page from the Google image search results that identified the ardentes.free.frblondes website but they were not told that Zellner never opened the website or any other web site listed as a result of the search in question. In open session, the School Board voted unanimously to terminate Zellner's employment and Pendergast issued a prepared press release to the media stating that accessing of pornography at any time or place in the District could not and would not be tolerated.

Immediately following that hearing, Pendergast made false and malicious statements about Zellner, asserting that it would be dangerous to allow him to teach teenagers. On January 21, 2006, the Milwaukee Journal Sentinel, published an article which attributed the false, defamatory and malicious statement to Korom that "'Zellner was caught accessing hardcore porn sites called 'pervert pics,' all-lesbian teens' and 'all sexy teenz.'" (Compl. ¶ 68.)

14

Zellner timely appealed the School Board's decision. The School Board affirmed its determination. Thereafter, as provided for in the CBA, Zellner invoked his right to have the issue of "cause" adjudicated in binding arbitration with the District.

In a September 14, 2006, decision, the arbitrator granted Zellner reinstatement because the arbitrator deemed his termination to be without cause and excessive for a one-time violation. The arbitrator awarded Zellner all back pay and benefits from the date of the termination of his employment, plus interest.

The District appealed the arbitrator's decision. To gain public support for the appeal, some or all of the Defendants caused the School Board to conduct a much publicized hearing at which a number of parents of District children, who were informed by the Defendants of the false and defamatory statements, expressed public outrage at the prospect of Zellner's reinstatement.

Zellner has lost his employment with the District and lost any prospective employment in his profession that is commensurate with his education, experience, salary history, and has suffered the loss of enjoyment of life. At age 42, Zellner intended to remain actively employed in his chosen profession for a minimum of 20 years.

Zellner now seeks recovery under 42 U.S.C. § 1983 for retaliation against him for exercising his First Amendment rights (First Claim) and for deprivation of his Fifth Amendment liberty interest without due process (Second Claim). Zellner claims that his employment was terminated in retaliation for his Union activity and not because he accessed pornographic images on his school computer.

*State Court Proceedings*

On October 17, 2006, the Union, on behalf of Zellner as a third-party beneficiary, filed a complaint in the Ozaukee County Circuit Court against the School Board. (Defs.' Reply Br. Ex. B.) Along with seeking confirmation of the arbitration award and judgment against the School Board, including an order requiring the Board to pay all amounts due to him under the award, plus statutory interest, the Union also sought damages for breach of contract because the Board breached the CBA when it refused to implement the arbitrator's decision.

On March 29, 2007, the Ozaukee County Circuit Court issued a decision and order in the 06-CV-501 action vacating the arbitrator's decision. (Defs.' Reply Br. Ex. A.) The court overturned the arbitrator's decision that there was not just cause to terminate Zellner's employment. The court relied on Section 115.31 of the Wisconsin Statutes, which defines immoral conduct and sets forth a disciplinary procedure to be followed by the Superintendent of Education in determining whether or not to revoke the teacher's license for engaging in such behavior. The court went on to state that the arbitrator's conclusion "that immoral behavior is some sort of infraction that can be lumped in with other violations in the absence of a stated policy is clearly at odds with Wisconsin law." (Defs.' Reply Br. Ex. A, 3.) The court agreed with the arbitrator that the District did not raise the issue in the original disciplinary hearing and, therefore, had waived its right to do so in the arbitration. However, the court held that "the expression of the public policy of [Wisconsin] as set forth in Wis. Stat. 115.31 should be sufficient notice to any person that there will be severe consequences

when any rule violation crosses into such type of conduct." (Defs.' Reply Br. Ex. A, 3.) Acknowledging the long standing and well-reasoned body of law that severely limited the court's review of an arbitrator's decision, the court held that there was clear convincing and satisfactory evidence that the School Board's decision was not arbitrary, that there was a rational basis for terminating Zellner's employment for viewing pornography, and "that the comparables cited by the arbitrator [were] factually incorrect and logically flawed." (Defs.' Reply Br. Ex. A, 4.)

On April 11, 2007, the Union filed the 2007AP852 appeal to the Wisconsin Court of Appeals. (Rynecki Aff. ¶ 2, Ex. (b).) On April 2, 2008, the Wisconsin Court of Appeals issued a decision certifying the following issue to the Wisconsin Supreme Court: "Does a reviewing court have the power to vacate an arbitration award that the court concludes is contrary to public policy?" (Rynecki Aff. ¶ 2, Ex. (b).) The Wisconsin Supreme Court denied certification of the question. (*See* 2007AP852 appeal Decision at 4, attached to July 29, 2008, letter from Riordan.)

On July 23, 2008, the Wisconsin Court of Appeals issued a decision affirming the Ozaukee County Circuit Court's decision. (*See* 2007AP852 appeal Decision attached to July 29, 2008, letter from Riordan.) On August 21, 2008, the Union filed a petition for review by the Wisconsin Supreme Court. (*See* Pet. for Review attached to August 28, 2008, letter from Erhard.) The petition for review was denied by the Wisconsin Supreme Court on January 13, 2009. (*See* 2007AP852 Order attached to January 15, 2009, letter from Riordan.)

*Rooker-Feldman Doctrine*

The Defendants raise the *Rooker-Feldman* doctrine as a basis for dismissal of this action. Federal courts are courts of limited jurisdiction. *See Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002). ("Jurisdiction is the 'power to declare law,' and without it the federal courts cannot proceed." (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577, 583 (1999)). Where *Rooker-Feldman* applies, the Court cannot reach any affirmative defenses. *See Taylor v. Fed. Nat'l Mortgage Ass'n*, 374 F.3d 529, 535 n.4 (7th Cir. 2004); *Garry v. Geils*, 82 F.3d 1362, 1365 (7th Cir. 1996).

The namesakes of the *Rooker-Feldman* doctrine, are two Supreme Court decisions, *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923), in which the Supreme Court articulated and applied, the rule that lower courts are precluded from exercising appellate jurisdiction over final state-court judgments. *See Kelley v. Med-1 Solutions*, 548 F.3d 600, 603 (7th Cir. 2008). The Supreme Court has highlighted the narrowness of the *Rooker-Feldman* doctrine. *See Lance v. Dennis*, 546 U.S. 459, 464 (2006); *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005); *Kelley v. Med-1 Solutions*, 548 F.3d at 603. The only two times that the Supreme Court has applied the doctrine are in *Feldman* and in *Rooker*. *Exxon Mobil*, 544 U.S. at 283.

"The *Rooker-Feldman* doctrine does not bar actions by non-parties to the earlier state-court judgment simply because, for purposes of preclusion law, they could be considered in privity with a party to the judgment." *Lance*, 546 U.S. at 466. Zellner was not

a party to the state court action. Therefore, the *Rooker-Feldman* doctrine does not bar this federal action.

*Claim Preclusion*

The Defendants also assert that claim preclusion bars the instant action. Zellner asserts that *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 59-60 (1974), is dispositive of the claim preclusion issue. The Defendants have not addressed *Alexander*.

In *Alexander*, 415 U.S. at 59-60, the Supreme Court held that grievance arbitration of an employment discrimination claim under a collective bargaining agreement did not foreclose a subsequent § Title VII employment discrimination claim. The arbitration decision in *Alexander* was not reviewed by a court. 415 U.S. at 42-43.

With respect to Zellner's § 1983 claims in this action, the Supreme Court's subsequent decision in *McDonald v. City of W. Branch, Mich.*, 466 U.S. 284, 290 (1984), is more pertinent than *Alexander*. *McDonald* held that awarding preclusive effect to an arbitration award in a subsequent § 1983 action would undermine that statute's efficacy in protecting federal rights. In *McDonald*, 466 U.S. at 288, the Supreme Court stated "[a]rbitration is not a 'judicial proceeding' and, therefore, [28 U.S.C. §] 1738 does not apply to arbitration awards."

Unlike *Alexander* and *McDonald*, this Court is presented with an arbitration award that has been subject to state court review, and, significantly, a state court judgment subject to 28 U.S.C. § 1738 which requires that judicial proceedings have the same full faith and credit in every court within the United States as they have in the courts of such state.

19

See *Burkybile v. Bd. of Ed. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 310-11 (2d Cir. 2005); 18B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure*, § 4475.1, 508-09 n.6 & n.7 (2d ed. 2002). So, *Alexander* and *McDonald* are distinguishable.

 "Under 28 U.S.C. § 1738, federal courts must give a state court judgment the same preclusive effect that it would receive under state law." *Wilhelm v. County of Milwaukee*, 325 F.3d 843, 846 (7th Cir. 2003) (citing *Allen v. McCurry*, 449 U.S. 90 (1980)). Wisconsin law on the doctrine of claim preclusion states that "a final judgment is conclusive in all subsequent actions between the same parties [or their privies] as to all matters which were litigated or which might have been litigated in the former proceedings." *Pasko v. City of Milwaukee*, 643 N.W.2d 72, 79 (Wis. 2002) (quoting *DePratt v. West Bend Mut. Ins. Co.*, 334 N.W.2d 883, 885 (Wis.1983)). The Wisconsin Supreme Court's approach to deciding when a subsequent action is barred is summarized in *Kruckenberg v. Harvey*, 279 Wis.2d 520, 694 N.W.2d 879, 885 (Wis. 2005). Three factors must be present in order to preclude the later action: (1) identity of the parties or privies in the prior and present suit; (2) prior litigation resulted in a final judgment on the merits by a court with jurisdiction; and (3) identity of the causes of action in the two suits. *Id*.

 Wisconsin uses the "transactional analysis," that is, "[a]ll claims arising out of one transaction or one factual situation are treated as being a part of a single cause of action, and they must be litigated together." *Wilhelm*, 325 F.3d at 846; *see also N. States Power Co.*

*v. Bugher*, 525 N.W.2d 723, 729 (Wis. 1995). State courts are appropriate forums to adjudicate section 1983 claims. *Wilhelm*, 325 F.3d at 847.

The first element of claim preclusion is an identity of the parties or their privies. "In order to be in privity with a party to a judgment, a nonparty must have such absolute identity of interests that the party to the earlier action represented the same legal interest as the non-party to that first action." *Pasko v. City of Milwaukee*, 643 N.W.2d 72, 79 (Wis. 2002). "In other words, privity compares the interests of a party to a first action with a non-party to determine whether the interests of the non-party were represented in the first action." *Id.*

The Wisconsin Supreme Court has stated that although a contractual relationship between a party and a non-party may provide evidence to show that the parties' interests were similar, the relationship itself is not necessarily determinative on the privity question. *Id.* (citing *Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995) ("Whether there is privity between a party against whom claim preclusion is asserted and a party to prior litigation is a functional inquiry in which the formalities of legal relationships provide clues but not solutions.")).

In *Pasko*, 643 N.W.2d at 74, the court addressed whether claim preclusion barred a lawsuit brought by the Milwaukee Police Association ("MPA") seeking a writ of mandamus because of a similar prior lawsuit brought by officers who were MPA members. The court held no privity existed between the officers in the earlier lawsuit and the MPA because although their interests overlapped, they were not identical. 643 N.W.2d at 79. The

court noted that the first action brought by the officers, sought to obtain relief for themselves based on their underfilling at the rank of police alarm operator. *Id*. In that action, the officers relied upon a state statute and the collective bargaining agreement in seeking back pay and promotions for themselves, contending that the City could not require them to work as police alarm operators without promoting them or paying them to work in that capacity. *Id*. at 79-80. Once the trial court determined that the statute did not require promotions of the officers to such rank, the officers abandoned that claim. *Id*. at 80. Instead, they pursued their claim under the collective bargaining agreement and, eventually, obtained relief in the form of payment for their services based on that agreement. *Id*.

The court noted that in the second action, the MPA sought a determination based solely on the state statute, arguing that the statute requires the promotion of any qualified officer to vacancies in the rank of police alarm operator. *Id*. The court noted the union's interest in filling such vacancies was not based on any unfairness to an individual; rather, the union's interests were ensuring that a classification for which it had specifically bargained was recognized by the City in filling those positions, and enforcing the state statute. *Id*. Thus, the court concluded that the MPA's pursuit of the promotions was based on different objectives and interests, focusing on the interests of all members. *Id*. (citing *Abels v. Titan Int'l, Inc.*, 85 F.Supp.2d 924, 933-35 (S.D. Iowa 2000) (union members were not precluded from bringing an action against their employer seeking declaratory relief under ERISA to clarify rights to future benefits under their pension plan even though their union had recently voluntarily dismissed a similar action seeking a declaration of rights under the

Case 2:08-cv-00315-RTR   Filed 01/22/09   Page 22 of 44   Document 39

collective bargaining agreement; the court found no privity between the parties because they had different interests)).

In this instance, the parties to the first suit were the Union and the School Board. The School Board was the Defendant in the state court action. A school board is "in charge of the schools of a school district." *See* Wis. Stat. § 115.001. The Defendants named in this action are Herrick, the District Superintendent; Pendergast, the School Board president; Korom, legal counsel to the District; Borkenhagen, the District information technology director; and the District. The District is the territorial unit for school administration. *See* Wis. Stat. § 115.01(3). Herrick, Korom and Borkenhagen are employees of the District. As president of the School Board, Pendergast is an agent of the School Board and acts on behalf of the District. The individual Defendants have the same interests in this matter as the School Board did in the previous suit. *See N. States Power Co.*, 525 N.W.2d at 728 (officers, employees and agents of state agency were in privy with agency which was a defendant in prior litigation). The Defendants were in privy with the School Board which was the defendant in the prior litigation.

The Union was the plaintiff in the prior action. Although Zellner was a third-party beneficiary of the action, the Union's interest was in confirming the arbitration award, reinstating Zellner to his teaching position, obtaining judgment in the Union's favor requiring the Board to pay Zellner all amounts due to him under the award, plus statutory interest from the date of the award, and obtaining the Union's costs and attorney's fees for having to enforce the arbitrator's award. The Union sought to enforce its rights under the CBA and

the results of the arbitration which benefitted Zellner. While the Union's interests overlapped

with those of Zellner, they were not identical. The Union did not have an interest in asserting

Zellner's personal constitutional rights. Additionally, it is unclear whether under Wisconsin

law, the Union would have standing to assert those rights.[4] Thus, this Court concludes that

Zellner was not in privity with the Union. *Pasko*, 643 N.W.2d at 74.

The first element of claim preclusion under Wisconsin law is not satisfied.

Since all three elements must be present for claim preclusion to apply, the Defendants have

not established that claim preclusion bars Zellner's § 1983 claims in this action.

---

[4] Under Wisconsin law, standing is not a question of jurisdiction, but of sound judicial policy. *Wisconsin Bankers Assn.,(Inc.) v. Mutual Sav. Loan Assn.*, 291 N.W.2d 869, 873 n.1 (Wis. 1980). *In Milwaukee District Council 48 v. Milwaukee County*, 627 N.W.2d 866, 877 n.8 (Wis. 2001), the court cited the Supreme Court's three-part standing test for associational litigants, including unions, in litigation of federal issues citing *UAW v. Brock*, 477 U.S. 274, 282 (1986). The state supreme court noted that the test allows an association

> to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Milwaukee Dist. Council 48*, 627 N.W.2d at 877 n.8 (quoting *Brock*, 477 U.S. at 282 (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). The court noted that the test limits the power of the federal judiciary, in part to comply with Article III, Section 2 of the United States Constitution. *Milwaukee Dist. Council 48*, 627 N.W.2d at 877 n.8 (citing *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551 (1996)) The court did not apply the test but cited it as persuasive authority for the proposition it adopted on the facts of that case: "[I]n certain circumstances, particular relationships . . . are sufficient to rebut the background presumption . . . that litigants may not assert the rights of absent third parties." *Milwaukee Dist. Council 48*, 627 N.W.2d at 877 n.8 (quoting *United Food and Commercial Workers Union Local 751*, 517 U.S. at 557.) *Milwaukee Dist. Council 48*, 627 N.W.2d at 876-77, held that a public employee labor union had standing to seek a declaratory judgment as to whether Milwaukee County could deny a pension to an employee who has ten years of creditable service after terminating the employment for cause (following a due process hearing ), without also holding a due process hearing to determine whether the employee was terminated for "fault or delinquency."

*Qualified Immunity*

The Individual Defendants assert that Zellner's claims against them in their individual capacities should be dismissed based on qualified immunity. Zellner states that dismissal on qualified immunity grounds is premature and procedurally infirm. He also argues that his First Amendment retaliation claim against the Individual Defendants should not be dismissed. He has not responded to the argument that his Fifth Amendment due process claim against the Individual Defendants in their individual capacities should be dismissed.

"[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "*Wilson v. Layne*, 526 US. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Supreme Court directs that a federal court considering a defense of qualified immunity must follow a two-step analysis. First, the Court must rule on "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." *Saucier v. Katz*, 533 U.S. 194, 201 (2001) The second step of the analysis then, "is to ask whether the right was clearly established." *Id*. A right is clearly established if "it would be clear to a reasonable officer that [his] conduct was unlawful in the situation he confronted." *Id*.

Case 2:08-cv-00315-RTR   Filed 01/22/09   Page 25 of 44   Document 39

*First Amendment Claim*

The First Amendment protects a public employee's right to speak as a citizen about matters of public concern, and an employer may not retaliate against an employee for engaging in protected speech. *Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 508-09 (7th Cir. 2007). Conversely, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Whether speech is protected is a question of law. *Davis v. Cook County*, 534 F.3d 650, 653 (7th Cir. 2008). *Mills v. City of Evansville, Ind.*, 452 F.3d 646, 647 (7th Cir. 2006), holds that *Garcetti*, requires that before asking whether the subject-matter of particular speech is a topic of public concern, the Court must decide whether the plaintiff was speaking "as a citizen" or as part of his public job.

If the Court determines that the plaintiff was speaking as a citizen, only then does the Court inquire into the content of the speech. *See Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir.), *cert. denied*, __ U.S. __, 128 S.Ct. 441 (2007). In determining whether speech is considered protected speech under the First Amendment, the Court applies the two-step *Connick-Pickering* test. *Schad v. Jones*, 415 F.3d 671, 674 (7th Cir. 2005) (citing *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist., 205*, 391 U.S. 563 (1968)).

When determining whether speech addresses a matter of public concern, the Court considers "the content, form, and context of a given statement, as revealed by the whole

26

record." *Cygan v. Wis. Dep't of Corr.*, 388 F.3d 1092, 1099 (7th Cir. 2004) (citing *Connick*, 461 U.S. at 147-48). Of those three factors, content is the most important. *Id.* The Court may also consider the employee's choice of forum and motivation for speaking. *Id.*; *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis, Ind.*, 42 F.3d 403, 410 (7th Cir. 1994) ("A number of our cases thus direct attention to 'the point of the speech in question; was it the employee's point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?") The speech need not relate to a large, vital, or globally significant issue to be protected, *see Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir.1996), but it must relate to more than personal grievances or private interests, *see Gonzalez v. City of Chicago*, 239 F.3d 939, 941 (7th Cir. 2001). Ultimately, the Court must determine whether the speech is most accurately characterized as an employee grievance, or as a matter of political, social, or other concern to the community, such as "something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *Id.* Each instance of speech must be separately to determine its protected status. *Wright v. Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1499 (7th Cir. 1994).

Second, under *Pickering v. Bd. of Ed. of Twp. High Sch. Dist., 205,* 391 U.S. 563, 568 (1968), the Court balances "the interests of [the employee], as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Even if a government employee's speech is on a matter of public concern, the government employer

is entitled to restrict that speech if it can prove that the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the government employer in promoting effective and efficient public service. *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002). The Court need not undertake to balance the respective interests of the speaker against those of the government unless the speaker first establishes that his speech addressed a matter of pubic concern. *Cliff*, 42 F.3d at 410.

A *Pickering* analysis is a highly fact-specific inquiry into a number of related factors: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform his responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public. *Gazarkiewicz v. Town of Kingsford Heights, Ind.*, 359 F.3d 933, 944 (7th Cir. 2004); *Gustafson*, 290 F.3d at 909.

Unless a plaintiff relies upon speech that is totally unprotected by the First Amendment, *Pickering* balancing is often possible only after the parties have had an opportunity to conduct discovery. *See Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997). *See also, Klug v. Chi. Sch. Reform Bd. of Trs*, 197 F.3d 853, 859 (7th Cir. 1999) (stating "[o]rdinarily, we are reluctant to perform the balancing on the basis of the pleadings, partly because the Federal Rules of Civil Procedure do not require that a complaint describe

alleged wrongdoing with particularity. Rule 8(a).") "*Pickering* balancing is not an exercise in judicial speculation." *Gustafson*, 290 F.3d at 909. The plaintiff has the burden of showing that his interest in exercising his rights outweighs the government interests in promoting the efficiency of its services. *See Coady v. Steil*, 187 F.3d 727, 732 (7th Cir. 1999).

A preliminary dispute between the parties is the applicability of *Garcetti,* issued on May 30, 2006, to the analysis of the School Board's January 17, 2006, termination of Zellner's employment. The Individual Defendants contend that *Garcetti*, 547 U.S. at 421, renders job-related speech claims unprotected and that Zellner's speech is not protected because all of Zellner's protected activity arose because of his employment with the District. Zellner contends that *Garcetti* is not relevant to the qualified immunity inquiry in this case because Zellner's rights were clearly established at the time of the alleged conduct.

The Individual Defendants cite decisions issued by the Court of Appeals for the Seventh Circuit applying *Garcetti* to First Amendment claims that arose prior to the Supreme Court's issuance of the decision, including *Vose v. Kliment*, 506 F.3d 565, 569-72 (7th Cir. 2007), which applied *Garcetti* to the analysis of qualified immunity. Plaintiff Vose, a police sergeant, claimed that he was compelled to resign from his employment on January 19, 2006, after speaking out about the misconduct of fellow police officers. The court of appeals determined that, under *Garcetti*, Vose's speech regarding the alleged misconduct was made pursuant to his official responsibilities for the operation of the narcotics department not as a private citizen. Therefore, the appeals court held that Vose's speech was not constitutionally protected and the defendants were entitled to qualified immunity. 506 F.3d

at 569-71. Zellner's employment was terminated within the same time frame – two days earlier to be precise – as the resignation at issue in *Vose*.

Moreover, the *Garcetti* Court applied its determination that, when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes and the Constitution does not insulate their communications from employer discipline to the litigants in that case. *See* 547 U.S. at 421-46. The Supreme Court held that the supervising deputy district attorney did not speak as a citizen for First Amendment purposes when he wrote a memo because it was written as a part of his official duties and, therefore, the Constitution did not insulate his communication from employer discipline. *Id.* The Supreme Court's immediate application of a rule of federal law to the parties before that Court requires every court to give retroactive effect to that decision. *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 90 (1993). Therefore, this Court has considered *Garcetti* in analyzing Zellner's First Amendment retaliation claim.

The Individual Defendants maintain that all of the protected speech and behavior alleged by Zellner arose in his connection as a Union leader and involved internal personnel decisions about which Zellner complained either as a Union representative, Union member, or outspoken opponent. Zellner argues that *Garcetti* does not make a difference in this case because, when taken in the light most favorable to Zellner, the facts alleged in the complaint establish that Zellner was not speaking out pursuant to his official duties as a teacher, but as a union leader. Zellner relies upon *Gregorich v. Lund*, 54 F.3d 410, 415-16 (7th Cir. 1995), in asserting that union activities may be protected speech.

In *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006), the court held that *Garcetti* was "inapposite" where a deputy sheriff spoke on a matter of public concern because he made public statements in his capacity as a union representative. The deputy sheriff, who had unsuccessfully run against the sheriff and served as president of the local union of deputy sheriffs made statements against the sheriff's personnel policies. In other words, a public employee who makes a statement in his capacity as a union representative is speaking as a citizen, not as an employee. *See Spiegla*, 481 F.3d at 966 (citing *Fuerst*, 454 F.3d at 774).

Taken in the light most favorable to Zellner, the facts alleged in the complaint establish that Zellner's speech in 2003 regarding the attempted unwarranted termination of the high school principal's employment and the use of public funds for that purpose was made in Zellner's capacity as a Union representative. The six other alleged instances of protected speech made by Zellner were made in his capacity as Union president.[5] Thus, at this juncture of the proceedings, *Garcetti* does not change the qualified immunity determination with respect to Zellner's First Amendment retaliation claim because Zellner was not speaking in the course of his official duties as a teacher.

The next step in the Court's analysis of Zellner's First Amendment claim is to determine whether each instance of Zellner's speech in his capacity as a Union representative or in his capacity as Union president addressed a matter of public concern. *See Gregorich*,

---

[5]Those instances were: (1) Zellner's opposition to the proposed refinancing of an unfunded liability because it would jeopardize the teachers' benefits, (2) his presentation of the survey regarding the job performance of all district administrators, (3) his opposition to Herrick's unilateral directive that Union representatives cease accompanying teachers to meetings with the administration, (4) his disclosure of the circumstances regarding Siebert's forced resignation which resulted in the recall election and the removal of two school board members, (5) his objection to the task force composition and use of a third party mediator, and (6) his initiation of the no-confidence vote by Union membership on Herrick's ability to lead the School District and his causing the vote to be published in a local newspaper and holding of press conferences regarding that vote.

31

54 F.3d at 415-16 (holding with respect to the right of free association claim of John Gregorich that union activities may be protected speech and applying the test of *Pickering*, 391 U.S. at 563, and *Connick*, 461 U.S. at 138).[6]

While union-related activities may be protected under the First Amendment, the Court must still "probe the record" to determine the precise content, form, and context of that activity. *See Gregorich*, 54 F.3d at 415-16. As previously stated, the content is the most important component. *Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002); *Wright*, 40 F.3d at 1501.

The May 22, 2003, statement regarding the attempted firing of the high school principal made by Zellner and 57 other high school staff members was a half-page statement in a local newspaper – a public forum. *See Smith v. Fruin*, 28 F.3d 646, 652 n.2 (7th Cir. 1994). The statement was addressed to the citizens of the District. It detailed Herrick's discredited testimony about the principal and stated that Herrick and the District had created an atmosphere of distrust between the District administration and the high school staff by pursuing the unwarranted case against the principal. The statement also indicated that Herrick had wasted taxpayer money for attorney fees and additional resources and damaged the high school's reputation. Zellner spoke as a Union representative. The immediate employment situation of Zellner and other high school staff members was directly related to

---

[6]The court held that Gregorich's efforts to promote unionization among the research attorneys of the Illinois court of appeals touched upon matters of public concern. 54 F.3d at 416. However, the court also held that given the state of the law at the time, the Justice who had fired Gregorich for engaging in the union-organizing activities had a reasonable basis for his conclusion that Gregorich had an obligation to refrain from taking such an adversarial role to the court and, therefore, the Justice could invoke the protection of qualified immunity. *Id.* at 416-18.

the communication because the comments related to Herrick and the District's attempt to remove the principal and the distrust generated by that unwarranted action. The animus between the high school staff, including Zellner, and Herrick and the District related to private and public concerns. However, even though Zellner was advancing some private interests when he raised the concerns about the attempted firing of the high school principal, his claim survives as long as he also intended to bring to light concerns about distrust that would impair the functioning of the high school – a matter of great interest to the public. *See Cliff*, 42 F.3d at 410. The unnecessary expenditure of taxpayer money and District resources, and damage to the high school's reputation were also of concern to the public. *See Khuans v. Sch. Dist. 110*, 123 F.3d 1010, 1016-17 (7th Cir. 1997). While not dispositive on the nature of the speech, the complaints also were presented in a public forum. *See Smith*, 28 F.3d at 652. Having considered its content, form and context, the Court concludes that Zellner's speech as union representative about the unwarranted attempted removal of the high school principal and the attendant unnecessary expenditure to taxpayer funds was protected speech.

Few facts are plead with respect Zellner's speech as Union president when he refused to agree to refinancing of an unfunded liability that would jeopardize teachers' benefits if a QEO was implemented. The complaint provides no detailed information on the content, and does not disclose the form or context of that speech. However, Rule 8 of the Federal Rules of Civil Procedure "does not require – or permit district judges to require – fact pleading." *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003). At this juncture of

the proceedings, construing the facts in the light most favorable to Zellner, the Court cannot say as a matter of law that the speech was unprotected.

The next matter relates to the results of the Union membership survey evaluating the job performance of each of the District administrators. Zellner attempted to present the survey results to the School Board members during a closed meeting. When Herrick prevailed upon the Board members not to open the survey results, letters were sent encouraging the members to open the survey results but the members did not yield to the request. Zellner was acting on behalf of Union members and the assessment of the job performance of District administrators by those employed in the schools is of interest to the public. Although the meeting was closed, Zellner's attempt to present the results at closed meeting does not preclude the survey results from being deemed a matter of public concern. *See Smith*, 28 F.3d at 652. At this juncture, the Court finds that the speech was protected.

Zellner also relies upon his statement to Herrick that the Union would not honor his unilateral directive that union representatives would no longer accompany teachers to meeting with the administration. No detailed information is provided in the complaint regarding the content, form, or context of that speech. Under Rule 8, this Court may not require that facts be plead. *Hoskins*, 320 F.3d at 764. At this juncture, construing the allegations regarding this speech in the light most favorable to Zellner, this Court cannot say as a matter of law that such speech was unprotected.

Zellner also relies on his public speech as Union president about the involuntary resignation of the basketball coach under circumstances that Herrick and the School Board

knew were insufficient grounds for removal of the coach. There is no indication that Zellner had any private interest in advocacy on behalf of the coach. The public had an interest in the involuntary and unwarranted removal of the coach and the School Board's involvement in that action. The public also responded by convening a recall election that resulted in the recall of two School Board members. From the information provided, the Court concludes that Zellner's speech regarding the coach's forced resignation was a matter of public interest.

Zellner also relies upon his public speech, as Union president, against the task force composition and selection of a third-party mediator who could not work with the task force. The complaint does not allege detailed facts about the content, form or context of this speech. However, again construing the facts in the light most favorable to Zellner, this Court cannot say as a matter of law that Zellner's speech as Union president regarding the task force composition and mediator selection was unprotected.

Zellner's initiation of the no-confidence vote by Union member teachers against Herrick and his causing the publication of the 95% no-confidence vote results in a local newspaper along with the two press conferences he held regarding those results are clearly a matter of public interest.

The Defendants rely upon *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2000), *Griffin v. Thomas*, 929 F.2d 1210, 1215 (7th Cir. 1991), and *Snider v. Belvidere Tp.*, 216 F.3d 616, 620 (7th Cir. 2000), contending that the Seventh Circuit has long held that work-related speech is not protected. However, those cases are distinguishable because the plaintiffs were complaining about personnel matters that affected them.

Case 2:08-cv-00315-RTR   Filed 01/22/09   Page 35 of 44   Document 39

*Taylor*, 214 F.3d at 790-91, involved complaints by former city employees, including a lawyer and a secretary/paralegal, that the corporation counsel was touchy, insensitive, profane, and a poor manager, and that the city attorney was a "racist," perceived as condescending, and had alienated secretaries by insisting they work harder. The court held those complaints did not involve matters of public concern as required for a First Amendment retaliation claim; rather, the complaints essentially concerned supervisory management styles. *Id*. at 791. The court also held that the city could penalize an unsupported defamatory accusation of racism, and employees were not engaged in debate about desirability of hiring racists, but, instead, simply contended that race influenced what happened to them, on the job. *Id*. at 792-94.

*Griffin*, 929 F.2d at 1215, involved a union grievance filed by an employee who was dissatisfied with her performance rating. *Snider*, 216 F.3d at 620, involved a municipal employee's complaints about a perceived salary disparity between her and a new employee.

At this juncture of the proceedings, this Court cannot hold as a matter of law that Zellner's seven incidents of speech were unprotected. Furthermore, as to the four speech incidents determined by the Court to be protected, the complaint does not include facts upon which the Court could balance the District's interests under *Pickering*, nor is a plaintiff required to plead such facts. *See Tamayo*, 526 F.3d at 1090. Therefore, the Individual Defendants' qualified immunity defense on Zellner's First Amendment claim is denied as premature. *See Delgado*, 282 F.3d at 521. *See also*, *Tamayo*, 526 F.3d at 1090-91.

*Fifth Amendment Liberty Interest Claim*

With respect to Zellner's Fifth Amendment due process claim, the Individual

Defendants assert that the provision only applies where a plaintiff's liberty interest is denied

without due process of law.  However, as stated in *Ulichny*, 249 F.3d at 704-05 (quoting

*Draghi v. County of Cook*, 184 F.3d 689, 693 (7th Cir.1999)):

> "The concept of liberty protected by the due process clause has
> long included occupational liberty – 'the liberty to follow a trade,
> profession, or other calling.'" *Wroblewski v. City of Washburn*,
> 965 F.2d 452, 455 (7th Cir. 1992) (citing *Lawson v. Sheriff of
> Tippecanoe County, Ind.,* 725 F.2d 1136, 1138 (7th Cir. 1984)).
> The cases have consistently drawn a distinction, however,
> between occupational liberty and the right to hold a specific job.
> The due process clause of the Fourteenth Amendment secures
> the liberty to pursue a calling or occupation, and not the right to
> a specific job. *Wroblewski,* 965 F.2d at 455; *Lawson*, 725 F.2d
> at 1138.  "It stretches the concept too far to suggest that a person
> is deprived of 'liberty' when he simply is not rehired in one job
> but remains as free as before to seek another." *Roth*, 408 U.S. at
> 575.

The elements of a claim that a government employer has infringed an employee's liberty to

pursue the occupation of his or her choice requires that (1) the employee be stigmatized by

the employer's actions; (2) the stigmatizing information be publicly disclosed; and (3) the

employee suffer a tangible loss of other employment opportunities as a result of the public

disclosure.  *Head v. Chi. Sch. Reform Bd. of Trs*, 225 F.3d 794, 801 (7th Cir. 2000).

However, simply labeling an employee as being incompetent or otherwise unable to meet an

employer's expectations does not infringe the employee's liberty. *Lashbrook v. Oerkfitz*, 65

F.3d 1339, 1348-49 (7th Cir. 1995). The employee's good name, reputation, honor, or

integrity must be called into question in such a way as to make it virtually impossible for the

employee to find new employment in his chosen field. *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997); *Lashbrook*, 65 F.3d at 1348-49; *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir. 1987).

Zellner claims he has been stigmatized as a result of the Individual Defendants' statements accusing him of pornography-related activity. Such statements are of the type that "might stain a reputation and threaten a livelihood." *McClure v. Indep. Sch. Dist. No. 16*, 228 F.3d 1205, 1211 (10th Cir. 2000)(quoting *McGhee v. Draper*, 564 F.2d 902, 911 (10th Cir. 1977)). *See also, Head*, 225 F.3d at 801.

However, the stigmatizing statements must rise to the level that makes it "virtually impossible" for the employee to obtain employment in his chosen field. This distinction is not a technical distinction. Rather, it is based on a line of cases that reaches back to *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951), which establishes that defamation by a public officer is not a constitutional tort, because the interest that it invades, the interest in reputation, is not deemed liberty or property within the meaning of the due process clauses of the Constitution. *Olivieri*, 122 F.3d at 407-08 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976); *Dishnow v. School Dist.*, 77 F.3d 194, 199 (7th Cir. 1996)). However, when the character and circumstances of the defamation are such as to have "'foreclose[d] his freedom to take advantage of other employment opportunities'" a government employee can bring a suit based on the deprivation of his liberty of employment or occupation. *Olivieri*, 122 F.3d at 408 (quoting *Paul v. Davis*, 424 U.S. at 710 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)). As *Olivieri*, 122 F.3d at 408,

states "[t]he classic case of this type, illustrated by *McGrath* itself, is a government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure." The court emphasized "[t]he distinction between mere defamation and an infringement of liberty of occupation is merely one of degree, especially when the defamation relates to a person's fitness for a particular type of employment, but it is a distinction to which the courts are committed." *Id*.

According to Zellner, the limitations on his employment make it impossible for him to obtain employment that is commensurate with his education, experience, and salary history. Zellner has alleged limitations on his job opportunities which fall short of making it "virtually impossible" for him to obtain employment in his chosen field. While the complaint, taken as true at this juncture of the proceedings, may establish that Zellner has been defamed, the impact does not foreclose Zellner's employment as a teacher. Therefore, the conduct of the Individual Defendants did not violate Zellner's liberty interest in his profession. Thus, Zellner's Fifth Amendment claim against the Individual Defendants in their individual capacities is subject to dismissal.

Furthermore, although not raised by the School District or the Individual Defendants in their official capacities, Zellner's Fifth Amendment liberty interest claim is dismissed for failure to state a cause of action. As such, Zellner's second cause of action for deprivation of a liberty interest without due process is dismissed.

*Allstate's Motion to Intervene, Bifurcate and Stay*

Pursuant to Rule 24 of the Federal Rules of Civil Procedure, Allstate moves the Court for an order allowing it to intervene in this action for the purposes of litigating its duty to defend Korom under a homeowners insurance policy and an umbrella insurance policy it issued to Korom. It also requests that the Court bifurcate and stay the action. No response to the motion has been filed.

In order to intervene as a matter of right, an applicant must establish "(1) the application is timely; (2) the applicant has an 'interest' in the property or transaction which is the subject of the action; (3) disposition of the action as a practical matter may impede or impair the applicant's ability to protect that interest; and (4) no existing party adequately represents the applicant's interest." *Security Ins. Co. of Hartford v. Schipporeit, Inc.*, 69 F.3d 1377, 1380 (7th Cir. 1995); *see also*, *Nissei Sangyo Am., Ltd. v. United States*, 31 F.3d 435, 438 (7th Cir. 1994). The absence of any of these factors requires a denial of the motion for intervention. *Am. Nat'l Bank & Trust Co. of Chi. v. City of Chi.*, 865 F.2d 144, 148 (7th Cir. 1989).

Rather than imposing a precise time limit, the timeliness requirement essentially means that the intervenor must "act with dispatch." *Nissei Sangyo Am., Ltd.*, 31 F.3d at 438. (Citation omitted.) The test sets out a reasonableness standard: "potential intervenors need to be reasonably diligent in learning of a suit that might affect their rights, and upon so learning they need to act reasonably promptly." *Id.*

Case 2:08-cv-00315-RTR   Filed 01/22/09   Page 40 of 44   Document 39

A prospective intervenor's interest must be direct, significant, and legally protectable. *Solid Waste Agency of N. Cook County v. U.S. Corps of Eng'rs*, 101 F.3d 503, 505 (7th Cir. 1996). "The clearest example of such an interest, although not always the clearest case for intervention as of right, is where the would-be intervenor has a legal claim that could be made the basis of an independent suit against the defendant in the action in which he seeks to intervene." *Id*. In determining whether, as a practical matter, disposition of the action may impede or impair the proposed intervenor's abilities to protect their interests, the existence of "impairment" depends on whether the decision of a legal question involved in the action would as a practical matter foreclose the rights of the proposed intervenor in a subsequent proceeding. *See Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 204 (7th Cir. 1982).

Allstate requests a declaratory judgment that Korom is not entitled to coverage or a defense for the claims in this lawsuit. At this point, Allstate is providing Korom with a defense while reserving its rights under the policy. Allstate's motion to intervene meets the requirements of Rule 24(a)(2) and is granted. *See*, *e.g*., *United States v. Thorson*, 219 F.R.D. 623, 627 (W.D. Wis. 2003) (holding an insurer's interest in avoiding potentially unnecessary expenditure of legal fees in the underlying action is sufficient to justify intervention as of right)*; Hagen v. Van's Lumber & Custom Builders, Inc*., No. 06-C-122, 2006 WL 3404772 at *3 (E.D.Wis. Nov. 22, 2006) (same). Because the Court finds that Allstate has met the requirements for intervention as of right under Rule 24(a)(2), it is unnecessary to address the issue of permissive intervention under Rule 24(b).

Allstate also requests a bifurcation and stay of the proceedings. The bifurcation coverage issues is the method preferred by Wisconsin courts. A district court may grant an intervening insurer's request for a bifurcated trial on the issues of coverage and liability. *See Carney v. Vill. of Darien*, 60 F.3d 1273, 1277 (7th Cir. 1995). However, at this juncture of the proceedings, the Court declines to grant Allstate's request. Allstate may raise the issue at the Rule 16(a) scheduling conference.

On March 24, 2009, at 9:30 a.m. (CST) the Court will conduct a Rule 16(a) scheduling conference with the parties to set a schedule that will govern the action. The Court will initiate the call.

The purpose of the conference call is to establish a Scheduling Order which will limit the time:

1. to join other parties and to amend the pleadings;

2. to file motions; and

3. to complete discovery;

The Scheduling Order may also:

4. modify the timing for disclosure under Rules 26(a) and 26(e)(1) and of the extent of discovery to be permitted;

5. provide for the disclosure or discovery of electronically stored information;

6. include any agreements the parties reach for asserting claims of privilege or protection as trial preparation material after information is produced;

7. the date or dates for conferences before trial, a final pretrial conference, and trial; and

42

8.      any other matters appropriate in the circumstances of the case. The time limitations set forth in the Scheduling Order may only be modified for good cause and with the Court's consent.  Fed. R. Civ. P. 16(b)(4).

Special attention should be given to Rule 26(f), which requires the parties to conduct a settlement/discovery conference at least 21 days prior to the initial scheduling conference described above.  The Rule 26(f) conference may be conducted by telephone. Rule 26 also mandates that the parties, within 14 days of their conference: (1) file a written report outlining the proposed discovery plan they have developed at their Rule 26(f) conference; and (2) make the required initial disclosures under Rule 26(a) regarding witnesses and documents.  In addition to the matters specified in Rule 26(f)(2) and (3), the Court requests that the proposed discovery plan submitted by the parties include a very brief statement of the nature of the case of no more than several sentences.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The Defendants' motion to dismiss (Docket No. 8) is **GRANTED** to the extent that Zellner's second cause of action for deprivation of a liberty interest without due process is **DISMISSED** for failure to state a claim.   In all other respects, the motion to dismiss is **DENIED**.

Herrick's motion to dismiss (Docket No. 11)is **GRANTED** to the extent that Zellner's second cause of action for deprivation of a liberty interest without due process is

**DISMISSED** for failure to state a claim. In all other respects, Herrick's motion to dismiss is **DENIED**.

Allstate's motion to intervene, bifurcate and stay (Docket No. 21) is **GRANTED** to the extent that Allstate will be allowed to intervene in this action, and **DENIED** without prejudice with respect to bifurcation and staying of the proceedings.

The parties **SHALL** participate in a Rule 16(a) telephone scheduling conference that the Court will conduct on **March 24, 2009, at 9:30 a.m.** The Court will initiate the call.

Dated at Milwaukee, Wisconsin this 22nd day of January, 2009.

BY THE COURT

s/ Rudolph T. Randa
**Hon. Rudolph T. Randa**
**Chief Judge**