**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**ROBERT ZELLNER,**

                **Plaintiff,**

**v.**

                **Case No. 08-C-0315**

**DARYL HERRICK,**
**JOHN PENDERGAST,**
**LINDA BORKENHAGEN,**
**and CEDARBURG SCHOOL DISTRICT,**

                **Defendants,**

---

**DECISION AND ORDER**

---

        The Plaintiff, Robert Zellner ("Zellner"), a high school biology teacher formerly employed by the Cedarburg School District (the "District"), brings this civil rights action pursuant to 42 U.S.C. § 1983. Zellner alleges that the Defendants, Daryl Herrick ("Herrick"), John Pendergast ("Pendergast"), Linda Borkenhagen ("Borkenhagen"), who are sued in their official capacities, and the District (collectively the "Defendants") violated his First Amendment rights when they terminated his employment. Zellner alleges that the District

1

terminated his employment in retaliation for his union activity rather than for accessing pornographic images on a District-owned computer.

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§1331 and 1332. Venue is proper in this District under 28 U.S.C. § 1391(b).

The parties refer to Zellner's claim as a First Amendment retaliation claim. However, *Kodish v. Oakbrook Terrace Fire Protection District*, 604 F.3d 490, 501 n.9 (7th Cir. 2010), issued after the completion of briefing on the summary judgment motion, "cautions" against describing claims for an employer punishing an employee for protected speech as retaliation claims because the infringement of First Amendment rights occurs when employers deter future speech as well as when they punish past speech. Thus, this Court will simply refer to Zellner's claim as a First Amendment claim.

This matter is before the Court on the Defendants' motion for summary judgment dismissing the action. The summary judgment motion is ready for resolution and is addressed in this Decision and Order.

### Penn Plaza

The Court begins its discussion of the motion with the thread of two issues raised by the Defendants' earlier motion to dismiss for failure to state a claim and addressed by this Court's January 22, 2009, Decision and Order. In the final pages of their opening summary judgment brief, the Defendants reassert that Zellner's claims are barred by claim preclusion

2

and the *Rooker-Feldman* doctrine,[1] relying upon *14 Penn Plaza v. Pyett*, ___U.S. ___, 129

S.Ct. 1456, 1472 (2009), which post-dated the Court's January 22, 2009, Decision and Order.

Zellner responds that the *14 Penn Plaza* decision supports the Court's prior rulings.

The Defendants' discussion of *Penn Plaza* is perfunctory and, ordinarily, would

not require any consideration, because it is not the role of the Court to make arguments for the

parties. However, if the *Rooker-Feldman* doctrine applied, the Court would lack subject matter

jurisdiction over this matter. Consequently, the Court will address *Penn Plaza* in that context.

*Penn Plaza* presented the issue of whether a provision in a collective bargaining

agreement ("CBA") that clearly and unmistakably required union members to arbitrate claims

arising under the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29

U.S.C. § 621 *et seq.*, was enforceable. The Supreme Court reversed the court of appeals'

holding in *Pyett v. Penn. Bldg. Co.*, 498 F.3d 88, 90 (2d Cir. 2007), that *Alexander v.

Gardner-Denver Co.*, 415 U.S. 36 (1974) forbade the enforcement of such arbitration

provisions.

*Penn Plaza*, addressed an unresolved tension between the *Gardner-Denver Co.*,

415 U.S. at 49-51, holding "that a collective bargaining agreement could not waive covered

workers' rights to a judicial forum for causes of action created by Congress," and the *Gilmer

v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33-35 (1991), holding "that an individual

---

[1] Under Rooker-Feldman, federal district courts lack jurisdiction to entertain suits brought by state-court losers to undo state-court judgments. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283-84 (2005); *D.C. Ct. of App. v. Feldman*, 460 U.S. 462, 482 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416 (1923).

employee who had agreed individually to waive his right to a federal forum *could* be compelled to arbitrate a federal age discrimination claim." 129 S.Ct. at 1463.

This Court's decision on the Defendants' motion to dismiss addressed *Gardner-Denver Co.*, 415 U.S. at 59-60, in the context of Zellner's assertion that it was dispositive of the claim preclusion issue. The Defendants have not explained how *Penn Plaza* relates to the *Rooker-Feldman* jurisdictional issue or to claim preclusion. Furthermore, the Court's independent consideration of *Penn Plaza* does not disclose that it has any bearing on the *Rooker-Feldman* line of cases. Therefore, the Court concludes that *Penn Plaza* does not provide a basis for changing the Court's prior ruling on the Defendants' motion to dismiss on *Rooker-Feldman* grounds. Thus, the Court will turn its attention to the balance of the Defendants' summary judgment motion.

## Summary Judgment Standard

In deciding the Defendants' motion for summary judgment, the Court applies the following standards. When considering a motion for summary judgment, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A party "opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that

4

there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248; also citing *Celotex Corp.*, 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *United States v. Rode Corp.*, 996 F.2d 174, 178 (7th Cir. 1993)).

"Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587.

In determining the material and undisputed facts, the Court has disregarded those proposed findings of fact and responses that constituted legal conclusions, were argumentative or irrelevant, or those that were not supported by the cited evidence or by citations specific enough to alert the Court to the source for the proposal. The Court also notes that, under this District's Civil Local Rule 56(b)(2)(B)(i), "mere disagreement with the movant's asserted facts is inadequate [to defeat summary judgment] if made without reference to specific supporting material." *See Montano v. City of Chi.*, 535 F.3d 558, 569 (7th Cir. 2008) (quoting *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003)).

5

Zellner was employed by the District as a high school science teacher from 1999 until January 17, 2006, when his employment was terminated by the District. (Zellner Aff. ¶ 1.) Zellner was chairman of the science department commencing in June 2005. Currently, Zellner is a resident of Hawaii.

At all times relevant, Jay Grieger ("Grieger"), the principal of the high school, was Zellner's immediate supervisor. Since July 1, 2001, Herrick has been the Superintendent of the District. Pendergast, who was elected to the School Board in the spring of 2004, has been the School Board president since 2005. Jack Dobson ("Dobson"), who preceded Pendergast as the School Board president, lost his school board position in a November 2, 2004, special recall election.

Borkenhagen is the Director of Technology for the District and has held that position for eight years. At all times relevant, Borkenhagen reported directly to Herrick and was a member of Herrick's District leadership council. The leadership council met frequently and, among other matters, discussed issues between the District and the Union. Herrick, Pendergast, and Borkenhagen are being sued in their official capacities.

James R. Korom ("Korom"), a resident of the State of Wisconsin, is an attorney in private practice at the law firm of von Briesen & Roper, S.C. At all materials times, Korom

---

[2]The relevant facts are taken from the parties' proposed findings of fact ("PFOF") to the extent that they are undisputed. Citations to quoted excerpts have been included even when the facts are undisputed.

represented the District regarding Zellner's actions in accessing and viewing pornography on a District owned computer.

*Zellner's Union Activities*

While employed by the District, Zellner participated in the Cedarburg Education Association (the "Union") in various capacities. Zellner was a Union negotiator from 1999 to 2003. He was the high school building representative for the Union from 2001 until he became the Union president in August 2003. Zellner was Union president through August 2005, when he resumed his former position as Union representative for the high school. Zellner held that position from September 2005 through January 17, 2006.

According to Zellner, in April of 2003, Herrick recommended that the School Board not renew Grieger's employment contract. The School Board voted four to three against non-renewal, rejecting Herrick's recommendation. In April of 2003, Zellner and 58 other high school staff members caused a statement to be published in a local newspaper that addressed their disagreement with the attempted non-renewal of Grieger's contract. The April 2003 statement was critical of Herrick and the then current School Board members.

On May 22, 2003, in his capacity as a Union representative, Zellner caused a one-half page statement to be published in the *Ozaukee County News Graphic* that was addressed "To the Citizens of the Cedarburg School District." (Lubinsky Aff. ¶ 4, Ex. A (Zellner Dep.) 94:7 - 95:5; Zellner Aff. ¶ 6, Ex. A.) The statement, signed by Zellner and 57 high school staff members, detailed Herrick's discredited testimony against Grieger and stated

7

that: "Herrick and the . . . District have created an atmosphere of uncertainty, distrust, and intimidation between the district administration and the [high school] staff, by pursuing an unwarranted case against . . . Grieger, using taxpayer money for attorney fees and additional school resources to pursue this unwarranted case; and damaging the excellent reputation of [the high school]." (Zellner Aff. ¶ 7, Ex. A.)

The CBA between the District and the Union for the years 2001 through 2003 expired on June 30, 2003. Upon expiration of that CBA, the School Board implemented a Qualified Economic Offer ("QEO") resulting in salary schedule step reductions for Cedarburg teachers, making them among the lowest paid in the area in terms of starting salaries, career earnings, and salary schedules. When Zellner became the Union president in late August 2003, he led the Union's negotiating team; Herrick and Korom represented the School Board in CBA negotiations.

In November 2003, Zellner, in his capacity as Union president, refused to agree to the refinancing of an unfunded liability that was proposed by Herrick. Zellner, as the Union president, also facilitated the Union's "District Leadership Survey Report" dated December 9, 2003. The document reported the results of a survey of the Union membership relating to the job performance of each of the School District's administrators, including Herrick and Borkenhagen and was critical of Herrick's performance as superintendent.

At a closed session meeting of the School Board conducted around the 2003 winter holidays, Zellner attempted to present the 2003 District Leadership Survey Report

8

results to the School Board. In Zellner's presence, Herrick directed the members of the School Board not to open the survey.

In December 2003, following a contentious CBA negotiation session, Herrick warned Zellner that "the gloves would come off" unless the Union "moved on." (Zellner Aff. ¶ 14; Armstrong Aff. ¶ 5, Ex. B (Zellner Dep.) 103:12-106:24.) During that conversation, Herrick also informed Zellner, as a courtesy, that a "prominent member of the community" had claimed that Zellner was "accessing adult sites." (Armstrong Aff. ¶ 13, Ex. J (Herrick Dep.) 72-75.) In response to Zellner's expression of concern, Herrick stated "it's not school related," and that he did not consider that the reported accessing of adult images related to Zellner's job performance, because there was no indication that Zellner had used a District computer to access those images. (*Id.*, Ex. J 75:10-23.) Prior to disclosing the claim to Zellner, Herrick conferred with legal counsel for the District so there would be no exposure to the District based on the information from the community leader.

Zellner related Herrick's comments to Dennis Boom ("Boom"), who in turn contacted Pat Connolly ("Connolly"), the Union representative for the region that included the District. Upon learning about the "gloves coming off" statement attributed to Herrick, Connolly advised Zellner to watch himself, because in Connolly's opinion, the District intended to terminate Zellner's employment. (Armstrong Aff. ¶ 6, Ex. C (Connolly Dep.) 15:8-16:6.)

9

In the spring of 2004, four new members including Pendergast were elected to the School Board. Zellner as Union president informed Herrick, in June 2004, that the Union would not honor Herrick's directive that Union representatives could no longer accompany teachers to meetings with administrators.

In the fall of 2004, Zellner as Union president spoke to a school board member, Pat McComis ("McComis"), relating to the non-renewal of the coaching contract for the high school basketball coach Ben Siebert ("Siebert").[1]

A group of community members including Stephen Castner ("Castner"), the spouse of a teacher who had participated in the 2003 District Leadership Survey, initiated the steps required to force a special recall election of two School Board members on November 2, 2004. As a result of that special recall election, two School Board members, including Dobson, were removed from office. Pendergast and the other four School Board members who had been elected in the spring of 2004 were not subject to that recall because they had been in office for less than one year.

In December 2004, Zellner as Union president, publically spoke in opposition to the creation of a task force by Herrick and the School Board, but does not know whether those statements in opposition were before the School Board. Zellner objected because, unlike the successful middle school task force, the high school principal or the vice principal, and

---

[1]There are factual disputes regarding Siebert's termination as the basketball coach. (*See* Defs.' Resp. Pl.'s PFOF ¶¶ 37, 38 & 40.)

10

other volunteer teachers (including Zellner) were not allowed to participate. Instead, participation was limited to four teachers selected by Herrick. Zellner's position was published in the local newspaper on January 18, 2005, in an article headlined "Exiting Chair Says Climate 'Too Political' to Continue Task Force." (Zellner Aff. ¶ 25, Ex. F.)

On December 16, 2004, approximately one month before Herrick's contract was to be considered for renewal by the School Board, Zellner informed Herrick that the Union executive board, led by Zellner, had secured a "no confidence" vote in Herrick's ability to lead the District in a positive direction. The "no confidence" vote was cast by 95 percent of the participating teachers.

On December 31, 2004, Castner sent an email to Zellner's District computer address, which among other matters, criticized Zellner for being inexperienced in dealing with the media and for allowing the School Board to "bury" the 2003 District Leadership Survey. (Zellner Aff. ¶ 19, Ex. B 1.) Zellner replied to Castner's email on January 1, 2005.

Shortly thereafter, a group of "concerned citizens," published an ad in the local newspaper that included a photocopy of the email exchange between Castner and Zellner and accused the Union of being the force behind the November 2, 2004, special recall election because it wanted the School Board to become pro-Union. The treasurer of that concerned citizen's group was the spouse of a District administration office secretary, who was a vocal opponent of the November 2, 2004, special recall election and the Union.

11

In January of 2005, not long after the publication of the no-confidence vote, Zellner attended a School Board meeting but he does not recall whether he spoke at the meeting. Within a month following the School Board meeting, Zellner attended two meetings, which included Herrick and Pendergast, where the no-confidence vote was discussed.

On January 6, 2005, in his capacity as Union president, Zellner issued a press release captioned FOR IMMEDIATE RELEASE – "District Teachers Vote 'No Confidence' in . . . Herrick." (Zellner Aff. ¶ 27, Ex. G.) Zellner also held a press conference to respond to questions about that vote, and caused the publication of a full page advertisement entitled "Seventeen Reasons for a Vote of No Confidence" in the local newspaper. (*Id*.) Except for the advertisement's title, the contents of the press release and the advertisement were the same. On January 6, 2005, the *Milwaukee Journal Sentinel* and the *Cedarburg News Graphic* also published articles headlined, respectively, "[Union] Renews Call for Herrick's Removal – Union Offers 17 Reasons to Oust Superintendent," and "Ignored [2003 District Leadership] Survey Part of Teachers' Dismay – Herrick, [U]nion Head Disagree on How Results Handled; Ex-Board Members Had Misgivings." (*Id.*)

In January 2005, the School Board requested that Union representatives, including Zellner, meet with Herrick; members of the District leadership team, including Borkenhagen; and, a member of the School Board for the stated purpose of attempting to improve communications and relations between the Union and the District, and to work out their differences. The meeting was held on January 24, 2005, and it was agreed that the

12

meeting's discussions would be "off the record," with no one taking notes. (Zellner Aff. ¶ 29.) Zellner asked Herrick to consider holding off on agreeing to any further extension of his employment contract until Herrick made some showing of a good faith effort to work with the Union in a positive and constructive fashion. Towards the end of the meeting, Pendergast entered the meeting. After the meeting, Herrick sent an email to Pendergast discussing what transpired in the meeting.

Within days after the January 24, 2005, meeting, Susan E. Easterday ("Easterday"), a vocal opponent of the November 2, 2004, special recall election and the Union, made an open records request. In response to that request, the District produced a January 24, 2005, email from Herrick to Pendergast discussing what occurred in the January 24, 2005, meeting. In the email, the production of which Zellner asserts breached the meeting participants' "off the record" agreement, Herrick stated that the teachers had delivered an "ultimatum," telling him "if the board offers me a two year contract and if I accept the second year, then the [Union] is refusing to continue to meet or work with me . . . The other option is if the board offers me a two year contract and I refuse the second year, the [Union] views this as an act of good faith on my behalf and would continue to work with me." (Zellner Aff. ¶ 32, Ex. I.) Shortly after the January 24, 2005, meeting, the Board offered, and Herrick accepted, a new two-year contract for the period from July 1, 2005, through June 30, 2007. (Zellner Aff. ¶ 33, Ex. I.)

13

Upon receiving the Herrick-Pendergast email, Easterday wrote the Ozaukee County sheriff and district attorney complaining that the Union "did threaten to injure" Herrick financially when it gave him the "ultimatum" during the January 24th meeting, and asked those officials to investigate whether the Union had broken any laws. (Zellner Aff. ¶ 35, Ex. I.) On February 11, 2005, the *Milwaukee Journal Sentinel* published an article entitled "Investigation Into 'Ultimatum' Urged." (Zellner Aff. ¶ 35, Ex. I.) The article quoted Herrick's January 24, 2005, email to Pendergast, and reported that the sheriff had turned the matter over to an officer "to determine whether an investigation is warranted." (*Id*.) The article also attributed to Zellner the statement that Herrick had 18 months left on his contract and Union members felt there was no need for the board to offer him a new contract. (*Id*.)

On or about March 9, 2005, Easterday made an open records law request to the District for copies of any emails between Castner and Zellner for the time frame from November 1, 2004 through March 7, 2005. Zellner did not disclose the Castner emails to anyone until March 14, 2005, when he disclosed their existence to Kristin Garoutte ("Garoutte"), Herrick's Secretary. After Zellner informed Garoutte that the emails existed, the District produced the Castner emails in response to Easterday's open records law request.

The April 2005, re-election of the incumbent School Board members gave the School Board what it considered to be a mandate to be "tough" in dealing with the Union. (Zellner Aff. ¶ 37.) By June 2005, the School Board and the Union had failed to reach agreement on a CBA for 2003 through 2005. The two sides were at an impasse on the same

14

unfunded liability and health insurance proposal that Zellner, on behalf of the Union, had rejected in late 2004, when Herrick had presented that demand on behalf of the School Board.

In June 2005, the School Board implemented a second consecutive QEO, resulting in further salary schedule step reductions and no insurance savings. That QEO made the Cedarburg teachers among the lowest paid in the area in terms of starting salaries, career earnings, and salary schedule.

In late August 2005, Zellner's term as the Union president ended and two Union members became Union co-presidents. Zellner assumed his prior position as the high school's Union representative. During his last few months as Union president and as the high school's Union representative, Zellner remained very involved in Union activities, particularly those activities relating to the continuing 2005 through 2007 CBA negotiations between the District and the Union that were deadlocked over the unfunded health insurance issue. From late August through January 2006, teachers picketed weekly outside the District administration building, and the School Board continued to demand self-funded insurance and was unwilling to enter into a CBA for 2005 through 2007 unless the teachers relinquished their right to bargain for health insurance in the future.

However, Zellner did not speak out publically or talk with Herrick or Pendergast regarding Union issues at any time after the February 24, 2005, School Board meeting. (Lubinsky Aff. ¶ 4, Ex. A 183-185.) Herrick had no dealings with Zellner in his Union capacity following Zellner's resignation as Union president in August 2005. At his July 2,

2009, deposition, Pendergast indicated that "there were acrimonious relationships to some degree between the . . . Union and the School Board while [he] was president." (Armstrong Aff. ¶ 14, Ex. K (Pendergast Dep.) 7:15- 25.)

*Computer Issues*

Sometime during the 2002 through 2003 school year, Zellner took his astronomy students to the IMC (library) so that they could use District computers to prepare power point presentation assignments. At the time, one of the students reported to Zellner that, upon disengaging the Google search engine filter on a District computer and conducting a Google image search, the search results pages that came up included adult "thumbnail" images, accompanied by adult website addresses. Zellner reported the incident to Roger Exley ("Exley"),[2] a District technology department employee. Exley told Zellner that commercially available software that could prevent students from disengaging the Google filters and accessing inappropriate or adult websites had not been installed on the District's network.

At his August 18, 2009, deposition, Exley testified that, while he did not recall that specific conversation, he "would expect that students at the high school would frequently encounter situations where, in connection with conducting a Google search, whether text or image, [they] would come up with results pages that would include one or more adult or otherwise inappropriate sites." (Armstrong Aff. ¶ 7, Ex. D (Exley Dep.) 28:19 - 29:2.) Exley

---

[2]Exley and Greg Arnold ("Arnold"), another District technology department employee, shared an office in the IMC.

also testified that he encouraged District employees to ask students who located inappropriate material to notify their teachers and their teachers to, in turn, notify him.

Zellner also asked Exley whether he [Zellner] would get into trouble if inappropriate or adult websites came up as part of the search results on Google searches that he conducted. Exley recalls a conversation with Zellner about something inappropriate popping up through a normal legitimate search. Exley said that he did not believe it would be grounds for termination; however, if the employee went to the inappropriate material purposefully "that would be a different story." (Armstrong Aff. ¶ 7, Ex. D 17-18:12-4.) At his deposition, Exley testified that he "got that question a lot of times from other Cedarburg employees. They were all concerned about that, that something inappropriate [would come up as part of the results on any given search] being in a school environment and that was a concern of a lot of teachers." (Armstrong Aff. ¶ 7, Ex. D 18:18-22.)

With respect to Zellner, Exley testified:

> I probably relayed to [Zellner] that search engine – search results for the most legitimate search would turn up inappropriate results. I don't think it was unusual to get those kinds of results . . . The [inappropriate] results would probably come up. That's what I related to him probably, if I recall correctly, [inappropriate or adult search] results would come up. And you have to understand, when the results come up there's, you know, 20 or so results, different websites come up with the search results. So he would never really visit any of those sites. He'd have to click on that individual result to access that website. So I told him that if he just searched for it and it came up, that wouldn't be – he's not actually visiting that site.

(Armstrong Aff. ¶ 7, Ex. D 18:19 - 21:17; *see also*, Armstrong Aff. ¶ 7, Ex. D 28:10-14.)

17

*District Computer Usage Policy*

Effective August 15, 2005, the School Board approved a computer usage policy entitled "Employee Access to Networked Information Resources" (the "District Computer Policy" or the "Policy.") On August 31, 2005, Zellner signed a receipt for the Policy acknowledging the following: "I have received a copy of the Employee Access to Networked Information Resources Policy. I have read the policy and its implementing Rule approved in August, 2005 and agree to comply with the provisions. I understand that violations may result in a loss of access and/or disciplinary action." (Lubinsky Aff. ¶¶ 4, 9, Ex. A 191-92, Ex. F (Zellner Dep. Exs.) Ex. 10 .) Zellner acknowledged that by signing the Policy receipt, he was responsible for complying with the Policy and the implementing rule (the "Rule").

In part, the Policy provides: "The Board expects that all employees will use electronic mail (e-mail) and telecommunications tools and apply them daily in appropriate ways to the performance of tasks associated with their positions and assignments." (Lubinsky Aff. ¶ 9, Ex. F, Ex. 11 at 1(unnumbered).) The Policy also states:

> Communication over e-mail or other telecommunication networks should not be considered private. Network supervision and maintenance may require review and inspection of directories or messages. The District reserves the right to access stored records in cases where there is reasonable cause to suspect wrong-doing or misuse of the system. The Superintendent or his/her designee may also examine communications in order to ascertain compliance with network procedures for acceptable use. E-mail and other telecommunication messages transmitted over District networks are considered District property and may be subject to provisions of the state public records law.

18

(*Id.*)  In addition, the Policy states "The network administrator will report inappropriate behavior to the employee's supervisor who will take appropriate disciplinary action."  (*Id.*)

The Rule contains similar language notifying District employees that their computer usage may be monitored and is not private:

> Network administrators may review files and communications to maintain system integrity and to ensure that District employees are using the system responsibly.  Users should not expect that files stored on District servers will be private.  E-mail and other telecommunication messages related to school business may be considered public records and subject to inspection, copying and retention in accordance with the public records law, District policies and procedures.

(*Id.* at Ex. 11 at 3 (unnumbered).)  The Rule specifically prohibits "[a]ccessing, sending or displaying offensive messages, pictures or child pornography."  (*Id.*)  The District has a record of the passwords for every District computer, including Zellner's.

### District Computer Reimagings

On November 1, 2004, the District's technology department "reimaged"; that is, wiped clean the hard drive of the District computer used by Herrick.  On November 4, 2004, one of the District technicians reimaged Zellner's District computer.  The reimaging was done in response to Zellner's November 3, 2004, reports of "spyware" and "pop-ups" on his District computer.  Borkenhagen was made aware of the reimaging about the time it was conducted. The District computers of a number of other District employees were also reimaged during the 2004 through 2005 school year.  After the November 2004 reimaging of Zellner's District

19

computer, he experienced no further problems with the computer for the remainder of the school year.

During the summer of 2005, Zellner used the District computer to prepare materials for a new environmental science course. However, Zellner did not use his computer for at least two weeks before Monday, August 29, 2005, a day or two before the start of classes for that school year. On August 29, 2005, Zellner used a colleague's computer to report that his computer had "gone crazy," and he was unable to access the internet, software, and devices.[3] (Lubinsky Aff. ¶ 9, Ex. F, Ex. 19.) However, Zellner did not complain about "pop-ups."

The August 29, 2005, Work Order for Zellner's District computer states that Zellner's request was a "high" priority and that the "date due" was Tuesday, August 30, 2005. (*Id.*) However, Zellner's District computer was not reimaged and returned to him until September 13, 2005.[4] At the outset of the 2005 through 2006 school year, a number of other teachers reported that "pop-ups" and "spyware" had infected their computers. In most cases, the computers were re-imaged.

Jeanne Dries ("Dries"), the technician who reimaged Zellner's computer, advised Borkenhagen that Zellner's computer was very messed up and that, in Dries's opinion, it

---

[3] Paragraph 27 of the Defendants' proposed findings of fact, which is undisputed, states that Zellner reported his computer had gone crazy in September of 2005. However, the paragraphs 85, 86, and 89 of the Plaintiff's proposed findings of facts, which are also undisputed, state that Zellner reported the computer problems on August 29, 2005. The August 29, 2005, date is supported by Zellner Exhibit 19, which is attached as part of Exhibit F to the Lubinsky Affidavit. Therefore, the Court has used the August 29, 2005, date.

[4] No explanation is provided for the delay in the reimaging of Zellner's computer.

"doesn't get that way without some behavior that – going to sites that were questionable." (Armstrong Aff. ¶ 12, Ex. I (Borkenhagen Dep.) 41:1-17.) Borkenhagen reported to Herrick, her supervisor, that Zellner's computer had to be reimaged a second time. Borkenhagen did not report her concerns that Zellner had violated the District computer usage policy to Zellner's supervisor, Grieger.[5]

Arnold, a technician employed by the District's information technology department, testified that the District computers were "re-imaged" frequently because "that was the easiest way to repair something that was software related. Yeah, that was very quick and easy and it was highly effective." (Armstrong Aff. ¶ 9, Ex. F (Arnold Dep.) 31:7-21.) Arnold indicates that it takes only 15 or 20 minutes to reimage a computer.

*Monitoring Software Installation*

Prior to the fall of 2005, Herrick told Borkenhagen that a community member had come forward expressing a concern that Zellner was into pornography, and Herrick asked Borkenhagen whether there was any way to monitor an employee's activity on a computer.

---

[5]The Defendants admit paragraph 97 of the Plaintiff's proposed findings of fact which states that Borkenhagen testified that because she (Borkenhagen) recalled her conversation with Herrick the year before, when Herrick told her about his conversation with "a prominent member of the community" who expressed concern that Zellner was "into pornography" and had asked her whether Zellner's computer could be monitored, she reported to Herrick, not Grieger, that Zellner's District computer was to be re-imaged a second time and that Dries suspected that it might have been misused. However, pages 74:8 though 75:19 of the Borkenhagen deposition which Zellner cites as the basis for that proposed fact do not support the proffered factual statement. Rather, the cited portions of the Borkenhagen deposition state that she reported the monitoring results to Herrick because he directed her to install the monitoring software and Herrick is her superior. Borkenhagen "believed it was [Herrick's] duty to tell the principal [Greiger] if he chose to." (Armstrong Aff. ¶ 12, Ex. I 75:14-15.) Borkenhagen also testified that she did "not get involved in personnel matters on a regular basis and [she] believed that since [her] directive was from [Herrick] to install the software that's to whom [she] should report the results." (*Id*., Ex. I 75:15-19.) The Court has considered the facts that the parties stipulated to as well as the cited deposition testimony of Borkenhagen.

Pursuant to Herrick's directive, Borkenhagen purchased three monitors, but the only one that was used was the one that was installed on Zellner's District computer. After learning from Borkenhagen that Zellner's computer needed to be reimaged a second time, Herrick directed Borkenhagen to have the monitoring software placed on Zellner's computer.

According to Herrick, he decided to have the monitoring software placed on Zellner's computer because of three incidents. The first was the information Herrick received in June 2003 from the prominent member of the community, a reverend, expressing concerns about Zellner's involvement with pornography at home and concerns about students going to Hawaii with Zellner on a school-sponsored field trip, including that those students would fall into harms way.

The second incident culminating in Herrick's decision to cause monitoring software to be placed on Zellner's computer was the need to reimage Zellner's computer for the first time in November of 2004. Herrick understood that in the course of the first reimaging of Zellner's computer, the District's technology department staff determined that Zellner's hard drive contained pornographic material. The third incident culminating in Herrick's decision to cause monitoring software to be placed on Zellner's computer was the need to reimage Zellner's computer a second time in September of 2005.

At Herrick's direction, Borkenhagen caused monitoring software to be installed on Zellner's District computer. The District had the right to install the monitoring software. When Herrick directed Borkenhagen to install monitoring software on Zellner's District

22

computer, Herrick had no knowledge of other pornographic pop-ups on other teachers' computers; he was not aware of any other District employee whose computer needed to be reimaged twice; and, Zellner was the only employee about whom a member of the community reported a concern regarding pornography.

The monitoring software continually logged Zellner's computer activity, but persons would have to physically open and view the log to see the activity. After the software was installed, Borkenhagen periodically checked the log; initially, she checked the log every day but after awhile she checked the log with increasingly less frequency.

*November 6, 2005, Google Image Search*

On the evening of Sunday, November 6, 2005, Zellner spent over three hours in his classroom at the high school using his school district computer to prepare for his classes that week. At 8:47:35 p.m., Zellner used the District computer assigned for his use to conduct a Google Images search. First, Mr. Zellner disengaged the "safe search" filter. He then typed the word "blonde" into the Google search box and hit "enter." The search produced a first page of 20 thumbnail images, all of them adult, together with website addresses with links to more images within and outside the Google website. He then clicked to display the second page of 20 "thumbnail" images with links to additional images within and outside the Google website. Zellner then clicked a link entitled "more of these" adjacent to images from www.ardentes.free.frblonde.com. When Zellner did so, another 20 adult "thumbnail" images were displayed on his monitor for a total of 17 seconds. At 8:48:49 p.m., Zellner returned to

23

the second page of the search results. Thereafter, at 8:48:52 p.m., he returned to the first page of the search results. Zellner did not click on any of the photographs displayed in his search. At 8:48:54 p.m., Zellner terminated the Google image search. The filter was disengaged on Zellner's District computer's Google image search engine for a total of 67 seconds.

*Discovery of the November 6, 2005, Google Image Search*

Borkenhagen was alerted by the search term "blond" in Zellner's activity on November 6, 2005.[6] Utilizing the "urls" or web addresses in the log, Borkenhagen recreated step-by-step the entire 67 second November 6, 2005, Google image search as viewed by Zellner. Zellner admits that the log of his actions on November 6, 2005, prepared by Borkenhagen was accurate. Borkenhagen exported the log, and delivered it to Herrick when they met on Tuesday, December 13, 2005. At that meeting, Borkenhagen walked Herrick through the steps that Zellner had taken to access the pornographic images. Herrick believes Borkenhagen provided him with the log of Zellner's computer usage from November 6th shortly after she discovered the computer usage. However, Borkenhagen did not discover Zellner's November 6, 2005, search until one or two business days before December 13, 2005.

Borkenhagen transmitted accurate information regarding the data from the monitoring software to Herrick. Zellner admits the log is accurate. Shortly after Herrick received information from Borkenhagen regarding Zellner's November 6th Google image

---

[6]There is a factual dispute between the parties regarding when Borkenhagen learned of Zellner's November 6, 2005, search. (*See* Pl.'s Resp. Defs. PFOF ¶ 59.)

search, Herrick conveyed that information, in general terms, to Pendergast. Herrick testified at his deposition that he also "probably described to [Pendergast] that [he] was going to contact legal counsel" for the District. (Armstrong Aff. ¶ 13, Ex. J 16:10 - 17:1.)

### The December 15, 2005, Milwaukee Journal Sentinel Article

A reporter for the *Milwaukee Journal Sentinel* interviewed Zellner several days before the Thursday December 15, 2005, publication of an article headlined "Cedarburg Losing More Teachers – Some Cite Low Pay, Politics at High School" on Thursday, December 15, 2005, in that newspaper. (Armstrong Aff. ¶ 15, Ex. L-22.) The article stated that "[t]his year, almost 20% of the high school's 75 teachers are new. The new drama and English teacher resigned recently, leaving the holiday musical in the lurch." (*Id.*) The article included statements provided by Pendergast and Herrick, and the following statement: "'When you start losing veteran teachers to retirement, that's one thing,' said [Zellner], a science teacher and former [U]nion president. But, he said, when younger teachers leave, 'It's a real warning sign.'" (*Id.*)

### The December 20, 2005, Meeting

A few weeks prior to Tuesday, December 20, 2005, Herrick made Pendergast aware of an upcoming meeting with a teacher in regards to improper use of the computer. Herrick testified that he "would have let [Pendergast] know about the December 20th meeting, that it was scheduled. I can answer yes to that." (Armstrong Aff. ¶ 13, Ex. J 25:16 – 26:5.) At his July 2, 2009, deposition, Pendergast could not recall whether Herrick identified the

25

teacher, Zellner, prior to the December 20th meeting. However, during that deposition, Pendergast acknowledged that, according to his testimony at Zellner's arbitration hearing, Herrick had identified Zellner as being the teacher in question prior to the December 20th meeting.

Herrick asked Borkenhagen to have Zellner's District computer removed from his classroom prior to the December 20, 2005, meeting. Herrick made the decision to preserve any evidence that might exist on Zellner's District computer. Herrick directed Borkenhagen to engage a forensic analyst to examine the hard drive on Zellner's computer. At Borkenhagen's direction, Arnold confiscated Zellner's school District computer in December 2005.

On December 20, 2005, Zellner and his Union representative, Patrick Connolly ("Connolly"), met with Herrick and Korom in Herrick's office. At the outset of that meeting, Korom stated that the meeting was not being recorded, explaining that a recording could be subject to production by the District in response to an open records law request.

During the meeting they discussed Zellner's use of his District computer, including his November 6, 2005, Google image search. There were two parts to the meeting, the first was the information gathering.[7] Zellner was asked to confirm the details of his "blonde" search and the images obtained thereby were accurate, which he did. At that meeting, Korom and Herrick displayed for Connolly and Zellner the color print-outs of the Google

_____

[7]There is a dispute between the parties about the nature of the second part of the meeting.

image search results pages. As of that date, Zellner believed that the color print-outs of the Google image search result that were showed to him during the December 20th meeting could be subject to production by the District in response to an open records request. Similarly, at the time of the December 20th meeting, Pendergast, Herrick, and Korom knew or had reason to know that the color print-outs of the November 6th Google image search results could be subject to production by the District in response to an open records request.[8]

Zellner was asked if he had performed searches like the "blonde" search before, and he confirmed that he had. According to Herrick, Zellner said that he accessed pornography on his District computer "not more than monthly." (Lubinsky Aff. ¶ 6, Ex. C (Herrick Dep.) 11:20-23.) According to Zellner, Herrick asked him "how often have you done that" to which Zellner believes he responded "once in that month." (Lubinsky Aff. ¶ 4, Ex. A 258:14-25.)

In response to Connolly's question about how many people knew about Zellner's November 6th Google image search, Korom identified Pendergast, Herrick, Borkenhagen, himself (Korom) and possibly one or two other people whose names Connolly did not recognize. During the meeting, Mr. Zellner admitted that his actions on November 6, 2005, were a violation of the District's policies and legitimate expectations. (Lubinsky Aff. ¶ 4, Ex A 333:7-10.) Zellner offered to sign a last chance agreement.[9] Zellner claims he offered to

---

[8]There is a factual dispute between the parties regarding whether during the December 20, 2005, meeting, Korom told Zellner that if he did not resign, the District would "go public." (*See* Defs.' Resp. to Pl.'s PFOF ¶ 135.)

[9]There is a factual dispute between the parties regarding Korom's response to Zellner's offer to enter into a "last chance" agreement pursuant to which his employment would be terminated in the event that he ever again engaged in the same type of conduct. The Defendants' dispute Zellner's contention that Korom responded on behalf

resign if could finish out the school year.  Zellner also inquired whether the District would sign a confidentiality agreement with a penalty clause if he were to resign.  The District rejected that proposal because it could not completely control whether information about Zellner's actions was released, yet it was the only one that was going to be penalized for a leak.  (Lubinsky Aff. ¶ 6, Ex. C 88:1-21.)

The School Board is the ultimate authority with respect to all personnel matters, and even resignations require School Board approval.   Many times the District's approval of personnel matters is routine.  The December 20th meeting ended by all parties agreeing that Zellner would have an extended period of time to decide whether to accept the District's offer to resign or proceed forward with an evidentiary hearing. Zellner was aware that any resignation would have required School Board approval.

When Zellner's proposal to enter into a "last chance" agreement was rejected, he concluded that the District was determined to "go public" with the color print-outs of the Google image search results regardless of whether he resigned.  Zellner also understood that he would no longer be represented by the Union if he resigned.  Pendergast claims that prior to the January 17, 2006, evidentiary hearing he was not aware that Zellner offered to enter into a "last chance agreement."

Zellner maintains that Herrick said they were going to recommend to the School Board that Zellner's employment be terminated and Zellner was aware that the decision of

_____

of the District stating, "We don't want you here anymore."  (*See* Defs.' Resp. to Pl.'s PFOF ¶ 137).

whether his employment would be terminated could only be made by the School Board. Specifically, Herrick told Zellner at the December 20th meeting that the decision whether to terminate his employment was "for the School Board to make" and that Herrick "had no say in the matter." (Lubinsky Aff. ¶ 4, Ex. A 268:15-23.)

*Events Preceding the Evidentiary Hearing*

After the December 20, 2005, meeting, Herrick advised Pendergast that Zellner would be considering his options over the Christmas holiday. Herrick told Pendergast, that Korom and he had offered to Zellner the option of resigning immediately, but that the Board might need to conduct an evidentiary hearing because the December 20, 2005, meeting had not proceeded as well as Herrick had hoped.

On about January 8, 2006, Korom informed Herrick that Zellner had decided not to resign. Thereafter, Herrick, Korom, and Pendergast conferred by telephone and "it was determined to hold a termination hearing in January." (Lubinsky Aff. ¶ 6, Ex. C 99:10 – 23). Herrick then met with Pendergast and Korom and it was determined that the School Board would hold an evidentiary hearing.

It was Pendergast's responsibility, as the board president, to decide whether to hold the evidentiary hearing in open or closed session. Pendergast did not discuss with Herrick and Herrick did not offer his opinion or input with respect to whether the evidentiary hearing should be in open or closed session. The decision was made exclusively by Pendergast. Pendergast decided to hold the evidentiary hearing in open session, rather than closed session.

29

Zellner has no reason to believe anyone else was involved in the decision to hold the evidentiary hearing in open session other than Pendergast. Pendergast made that decision about a week in advance of the January 17, 2005, hearing.[10] Pendergast knew Zellner requested the evidentiary hearing be conducted in closed session. Pendergast testified that he made that decision without seeing the "Charges Supporting Discharge from Employment of Robert Zellner" ("Charges") that Herrick prepared and signed on January 12, 2006. (Zellner Aff. ¶ 60, Ex. J.) Pendergast's decision to hold the evidentiary hearing in open session was not intended to put pressure on Zellner to reconsider his position not to resign or cause Zellner to resign.

Pendergast did not have specific knowledge of what evidence the District had to support the claim, except that Herrick had told him that the District had discovered improper use of the computer and that it involved pornography. Pendergast was aware of open meetings requirements regarding posting of agendas for public meetings. At his deposition, Pendergast testified that he first learned that the District had actual pornographic images on the night of the January 17th evidentiary hearing or possibly the day before, when Herrick informed him that it had the images.

Pendergast also testified that, prior to the public evidentiary hearing on January 17, 2006, he was not provided with any specific information relating to the charges against

---

[10]There is a dispute between the parties as to the reasons why Pendergast decided to hold the evidentiary hearing in open session. (*See* Pl.'s Resp. Defs. PFOF ¶ 98.) Korom testified: "At every meeting of every [S]chool [B]oard closed sessions can only be held upon motion of a board member to go into closed session, seconding of that motion and a vote by the full board." (Second Lubinsky Aff. ¶ 10, Ex. G (Korom Dep.) 9:18-25.)

Zellner. Additionally, Pendergast testified that in making the decision to hold the evidentiary portion of the hearing in open session, Pendergast considered the potential damage to Zellner's reputation and profession that would result from a public hearing, regardless of the action taken by the Board. With regard to allowing the public evidentiary hearing, Pendergast also testified that "[y]ou don't have to be too bright to figure out that if it's improper use of the computer, that it involves pornography, that an open session would be one in which the community would have a deep interest in — immediately would have a deep interest in. It's sizzle, if you will, for their papers." (Armstrong Aff. ¶ 14, Ex. K 44:2-8.)

The long-standing practice of the School Board when noticing hearings at which possible disciplinary action or termination of a District employee was to be considered, was not to identify the District employee by name and not to describe the charges that were to be considered.[11] However, the notice of hearing that Pendergast caused to be published in advance of the January 17, 2006, evidentiary hearing identified Zellner by name and described the charge against Zellner as misuse of a school district computer.

The noticed agenda for the evidentiary hearing stated as follows: "The Board may conduct an evidentiary hearing concerning allegations that . . . Zellner, a teacher of the District, while on District property, misused the District's computer system, and if so, the

---

[11]The Defendants object to paragraphs 156 and 157 of Zellner's proposed findings of fact maintaining that the cited paragraphs of the Zellner affidavit, paragraphs 63 and 64, do not include the underlying facts. The Defendants are correct. However, the relevant information *is* contained in paragraphs 66 and 67 of the Zellner affidavit. The discrepancy between the cited paragraphs and the paragraphs that contain the supporting facts is apparently the result of a typographical error. Consequently, the Court has included the factual statements of paragraphs 156 and 157 of Zellner's proposed findings of fact in its statement of the relevant facts.

Board may determine the penalty for such conduct." (Zellner Aff. ¶ 60, Ex. K.) The noticed agenda for the evidentiary hearing was released in the same manner as other legal notices for the District, namely by posting the notice on standard posting boards in the District and releasing the notice to two local newspapers.

Before the evidentiary hearing, Herrick asked Borkenhagen to locate a forensic analyst to inspect Zellner's computer hard drive to determine if there was any other inappropriate content that had been deleted. Borkenhagen contacted a firm, TSR, which analyzed the hard drive and returned it to Borkenhagen with a disk of the files it found on the hard drive. Borkenhagen provided Herrick with the disk. At Herrick's request, Borkenhagen printed the photographs from the disk and provided the copies to Herrick. Approximately 1500 "adult" images were discovered on the hard drive of Zellner's District computer.

A statement of Charges against Zellner was prepared, with the assistance of the District's legal counsel, which Herrick signed.[12] The charges were supported by firsthand knowledge from either Herrick or information from Borkenhagen. Herrick does not recall if Borkenhagen reviewed the charging document. However, he relied on information she provided in preparing the charging document.

With correspondence dated Friday, January 13, 2006, Herrick mailed to Zellner "via certified return receipt mail" copies of the Notice of Special Meeting as well as the

---

[12]A true and correct copy of the Written Charges, bearing Herrick's signature and the date of January 12, 2006, is attached to the Zellner Affidavit as Exhibit J. An unsigned and undated copy of the typed portion of that document was identified in discovery as Exhibit 12. (Zellner Aff. ¶¶ 59-60.)

District's "Charges Supporting Discharge from Employment of Robert Zellner" (the "Charges").[13]   Zellner and/or his representatives received a copy of the statement of the Charges prior to the evidentiary hearing.

Paragraph 5(g) of the Charges reads as follows: "He [Zellner] selected one photo from the second page of his search results, and accessed the website entitled 'ardentes. free.freblonde,' and then reviewed images on that pornographic website." (Zellner Aff. ¶ 60, Ex. J.)  Paragraph 7 of the Charges states that "[a]nalysis of Mr. Zellner's computer revealed additional evidence.  Among other images, . . . Zellner had retained photographs of female students of the District wearing bikinis while on a school-sponsored trip to Hawaii, chaperoned by . . . Zellner."  (*Id*.)

The images of high school girls on the hard drive of Zellner's confiscated District computer were from digital photographs taken by his students while they were in Hawaii participating in District-sponsored marine biology courses.   Some of those photographs were included in the high school yearbook.  The images were on the hard-drive because Zellner and several students had collaborated previously in preparing a souvenir CD for distribution to trip participants.  The CD contained a selection of the digital photographs from the Hawaii trip. Pendergast testified that, in his view, none of the photographs of students on the Hawaii trip were inappropriate or depicted conduct that was inappropriate.

_____

[13]True and correct copies of those three documents are attached as Exhibit K to the Zellner Affidavit. (Zellner Aff. ¶ 60.)

Paragraph 9 of the Charges states that "Zellner was given the opportunity to resign his employment to minimize the impact of his behavior on his family and his personal reputation. After considering this option between December 21, 2005, and January 8, 2006, Zellner chose not to resign, resulting in the necessity of submission of this document." (*Id.*)

On Monday, January 16, 2006, the day before the public evidentiary hearing, the *Milwaukee Journal Sentinel* published an article that headlined "Teacher Accused of Accessing Adult Images." (Armstrong Aff. ¶ 15, Ex. L-28.) The article reported that:

> School Board President John Pendergast said he chose to open [the] hearing to the public to avoid "misinformation" that could spread if the allegations were discussed in a closed meeting. "We're just making sure that the community is aware, of what the allegations are and that they can observe the process," Pendergast said.

(*Id.*)

Prior to the January 17, 2006, evidentiary hearing, the School Board did not see the Charges. Zellner has no reason to believe that Pendergast had any role in drafting the Charges. Pendergast does not recall seeing the Charges prior to the January 17, 2006, hearing.

### The School Board Evidentiary Hearing

On the evening of January 17, 2006, the School Board held a meeting to conduct an evidentiary hearing regarding the Charges against Zellner. At the evidentiary hearing, Zellner was represented by Union counsel; Korom represented the administration; and, the School Board was represented by separate legal counsel. Zellner was in attendance for the

34

entire evidentiary hearing and he had a full and complete  opportunity to prepare and present evidence at that hearing.

Pendergast believes that the Charges were presented at the evidentiary hearing. He does not recall whether they were handed out or read into the record.  The purpose of the evidentiary hearing was to determine veracity of the Charges against Zellner.  Both parties  – the administration and Zellner  –  were allowed to present evidence so that the School Board could determine whether or not any or all of the Charges were true.  If evidence was offered by the administration that Zellner objected to, it was his responsibility to object to that evidence and have the Board determine whether to sustain or overrule the objection.  Zellner's counsel was responsible for countering evidence or presenting Zellner's own evidence to the School Board.  The School Board heard testimony from several persons including Herrick and Connolly.

During his testimony, Herrick related his conversation with the Reverend, the two reimagings of Zellner's computer, the District's Policy, Zellner's November 6th Google image search, and Herrick's December 20, 2005, meeting with Zellner, including Zellner's admission to viewing pornography on his District computer.  Herrick testified that during their December 20, 2005, meeting, Zellner admitted doing similar searches using different terms, including blonde and Venus; that he successfully accessed websites and viewed pornographic materials on no more than a monthly basis; and, that he conducted these searches on the weekends and not during school hours.

Zellner called Connolly as a witness at the evidentiary hearing. Connolly testified that at the December 20th meeting, Zellner "admitted freely everything" and that he "spoke openly and immediately about everything that he had done." (Korom Aff. ¶ 7, Ex. A (Jan. 17, 2006, Tr.) 75.) With regard to Zellner's admission to conducting similar searches prior to November 6, 2005, Connolly testified: "Korom then asked him how many times he had done it at school. He thought – He said maybe one other time, I don't really remember." (Korom Aff. ¶ 7, Ex A 71.)

At the conclusion of the testimony, Zellner chose to read a statement to the School Board; he did not testify and that was his choice. In his statement, Zellner did not offer any excuse for his actions in accessing pornography on his District computer on November 6, 2005. Zellner stated in part: "I am truly sorry for what has happened" and "I know I used poor judgment in this case. I made a mistake and it will never happen again." (Korom Aff. ¶ 7, Ex. A 94.)

Zellner never told the School Board what he claims in his Complaint was his original purpose in conducting the Google image search. Zellner did not speak to the School Board at all as to what his intent was in accessing the adult images on November 6, 2005; Zellner does not believe the School Board knew what his intent was in performing the Google image search.

Herrick was the only witness the District called; Zellner called all the other witnesses who testified at the evidentiary hearing. Zellner was not prohibited from presenting

36

any evidence at the hearing.  Other than offering Connolly's testimony, Zellner did not refute or dispute Herrick's testimony about the December 20, 2005, meeting.  Borkenhagen did not testify or attend the hearing.

At Pendergast's deposition, he was asked, "isn't it a fact that the only reason the community would know about the alleged conduct of Mr. Zellner was because the evidentiary hearing had been conducted in public or, put another way, had the hearing been conducted in closed session then the Board wouldn't have to have had the concern that you expressed . . ., that some students, some community members, might be uneasy if you were to proceed with a last-chance letter?"  (Armstrong Aff. ¶ 14, Ex. K 68-69.)  Pendergast responded:

> I'm not sure I understand. The decision to have the hearing in
> open session was a decision that I made based on my evaluation
> of the right for the community to be informed of what's  –  of
> business in the district versus . . . Zellner's desire for privacy or
> other reasons for a closed session.  In the end, for the reasons I've
> already stated, I made the decision to have it in open session.

(*Id.*)

The School Board listened to all of the evidence and then deliberated about the credibility of the evidence and the outcome that should result from the evidence.  At the conclusion of the evidentiary hearing, the School Board deliberated in closed session for a few hours.  The School Board considered various reprimands ranging from suspension from work for a few months to termination of Zellner's employment.  The School Board also considered Zellner's attorney's suggestion of a last chance agreement, but in the end the School Board

concluded that termination of Zellner's employment was the appropriate reprimand. Zellner was not present during the closed session and, therefore, he does not know what the School Board discussed during that session.

Pendergast entered the deliberations unsure of the reprimand that would be appropriate. The deliberations consisted of talking through the evidence presented and then discussing the evidence. After the School Board decided that termination of Zellner's employment was the appropriate reprimand for his actions, the School Board drafted a statement that it read upon reconvening in open session. Pendergast decided that termination of Zellner's employment was the appropriate remedy based on all the evidence presented.

The School Board issued a news release immediately following the conclusion of the public meeting on January 17, 2006. A *Milwaukee Journal Sentinel* article headlined "Cedarburg Teacher Who Viewed Porn at School Fired – How Often He Accessed Images Is Disputed" was "posted" on January 17, 2006.

*The Arbitration and Appeal*

After the School Board terminated Zellner's employment, Zellner filed a grievance. The grievance went to arbitration. The log that Borkenhagen had exported and provided to Herrick was introduced as evidence at the arbitration hearing.

At the arbitration, Pendergast was asked, "Did you consider the impact of the grievant's behavior about pornography in the [D]istrict, the impact upon the students and others working in the District?" Pendergast responded:

38

> Sure. We deliberated for a couple of hours. A lot of the deliberation was or part of the deliberation was if . . . Zellner was teaching in the [D]istrict after a suspension or something like that, you know, what would be the outcome of that. And, of course, our concern is that we would have issues with parents or students being put in – feeling uncomfortable, threatened, whatever, in his classroom because now everybody would know that . . . Zellner had viewed pornography multiple times in the [D]istrict and therefore we have this issue of, you know, students coming back and feeling uncomfortable in this environment because of that. Would all students feel that way? I don't know, I doubt it, but would some students feel that way, I would venture to say yes. Therefore, we talked about the impact on the students if . . . Zellner was allowed to teach in the [D]istrict after suspension or I think the proposal that night was to continue teaching just as if – with a . . .Last-chance letter. . . . Here is one option and we talked about that and said well, that's fine for . . . Zellner, but what about the students that have to be in his class, what's the impact on them. Part of our decision was that no, we can't put our students in that kind of environment.

(Armstrong Aff. ¶ 14, Ex. K 66:8 – 68:6.)

The arbitrators found that Zellner violated the District's policy. However, the arbitrators rescinded the School Board's termination of Zellner's employment. The School District would not abide by the arbitrators' decision.

Zellner filed a lawsuit in the Wisconsin circuit court seeking confirmation of the arbitration award. Both the trial court and Wisconsin Court of Appeals found that the School Board's termination was supported by just cause, and reversed the arbitrators' award. The court of appeals's decision approving Zellner's termination is final and cannot be appealed.

39

**Analysis**

The Defendants assert that Zellner's First Amendment claim should be dismissed on summary judgment because he has not established a *prima facie* case. They also maintain that Zellner has not presented any evidence that the Defendants' legitimate non-discriminatory reason for his discharge was not the true reason for the termination of his employment. Additionally, the Defendants contend that Zellner cannot establish any basis for the District's liability.

In opposition to the Defendants' motion, Zellner asserts that he has presented sufficient facts to establish a *prima facie* case which, together with the evidence of pretext, is sufficient to sustain a finding of liability for unlawful retaliation. Zellner makes the conclusory assertion that the December 20, 2005, meeting itself constitutes retaliation. (See Pl.'s Opp'n Defs.' Summ. J. Mot. 43). He also contends that the District has a municipal custom or practice that, although not authorized by official law or policy, was the moving force behind the constitutional injury to Zellner.

*First Amendment Claim – Termination of Employment*

Zellner's central First Amendment claim arises out of the termination of his employment. For purposes of the summary judgment motion, Zellner is deemed to have established the first two elements of a *prima facie* case. Causation – the third prong of the *prima facie* case – is the sole element that the Defendants contest on summary judgment. The

40

Defendants contend that Zellner has not presented evidence upon which a reasonable jury could find that his speech was a motivating factor in the District's adverse action.

In countering that he has presented sufficient evidence from which a reasonable jury could find that his speech was a motivating factor in the District's termination of his employment, Zellner relies upon temporal proximity. Primarily, Zellner relies upon the juxtaposition of the December 15, 2005, publication of the *Milwaukee Journal Sentinel* article in which Zellner was critical of the District and the December 20, 2005, meeting. As further support of causation, Zellner cites the several years of acrimony between himself and the Union versus the District and the School Board; the District's new policy on computer use; Herrick's actions with respect to the installation of the monitoring software on Zellner's computer; and, Borkenhagen's breach of the Policy *proviso* requiring the reporting of any Policy violations to the violator's immediate supervisor.

### *Prima Facie Case* – Causation

In considering whether Zellner has presented sufficient evidence to establish a *prima facie* case, the Court begins with *Gunville v. Walker*, 583 F.3d 979, 984 n.1 (7th Cir. 2009). *Gunville*, 583 F.3d at 984 n.1, explains that prior to the Supreme Court's decision in *Gross v. FBL Financial Servs.*, Inc., ___ U.S. ___, 129 S.Ct. 2343 (2009), a plaintiff could prevail in a First Amendment § 1983 action if the plaintiff demonstrated that his speech was a motivating factor in the defendant's decision. However, after *Gross*, plaintiffs in federal suits must demonstrate but-for causation unless a statute, such as the Civil Rights Act of 1991,

41

provides otherwise.  *Id.*  Thus, in order for a public employee to establish a *prima facie* case that he was punished by an employer because of speech in violation of the First Amendment, the employee must establish that:  (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter him from exercising his First Amendment rights; and, (3) his speech was a "but for" cause of the adverse employment action.  *See Gunville*, 583 F.3d at 983.

In arguing causation, Zellner focuses on the five-day interval between the publication of the *Milwaukee Journal Sentinel* article and the December 20, 2005, meeting about his Google image search.  "Temporal proximity is only evidence of causation."  *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).  In some cases, a plaintiff may be able to establish causation despite a substantial time lag.  *See Lalvani v. Cook County*, 269 F.3d 785, 791 (7th Cir. 2001).  However, often time "may be an important evidentiary ally of a plaintiff pressing a retaliation claim."  *See id.* at 790.  "When an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie case* is typically satisfied."  *See id.* (citing *Sanchez v. Henderson*, 188 F.3d 740, 747 n.4 (7th Cir. 1999); *Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir. 1997)).  However, conversely, as the time separating the protected conduct and the adverse employment action grows, the causal inference weakens and eventually time becomes the plaintiff's enemy.  *Lalvani*, 269 F.3d at 790.

42

"[T]he fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation." *Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006). Notably, prior to the article's publication, Borkenhagen had discovered Zellner's November 6, 2005, Google image search *and* Borkenhagen and Herrick had met to discuss Zellner's conduct. Additionally, the December 20, 2005, meeting had been scheduled before the article was published.

Furthermore, at the December 20, 2005, meeting, Zellner admitted that he violated the District's Policy. The District offered to allow Zellner to resign immediately. After Zellner rejected that option, Herrick, Pendergast, and Korom decided that the School Board would conduct an evidentiary hearing. As such, it was the School Board that made the decision to terminate Zellner's employment. Zellner has not presented any evidence suggesting that any Board members were aware of Zellner's statements that were included in the December 15, 2005 article. Absent such evidence, there is no basis upon which a reasonable jury could find that, "but for" Zellner's December 15, 2005, statements, the School Board would not have terminated Zellner's employment. Consequently, despite construing the evidence and the reasonable inferences from that evidence in the light most favorable to Zellner, the Court cannot conclude that a reasonable juror could find that Zellner's statements in the December 15, 2005, article relating to teacher retirements are evidence that "but for" those statements Zellner's employment would not have been terminated. *See Kodish*, 604 F.3d at 501.

43

Furthermore, while Zellner's focus on the correlation of the timing of the December 15, 2005, publication of Zellner's speech and the December 20, 2005, meeting to address Zellner's Google image search is superficially appealing, a more appropriate perspective is provided by a comprehensive chronological approach to considering Zellner's Union-related activity that placed him at odds with Herrick. As early as May 2003, Zellner caused a statement to be published in the local newspaper decrying Herrick's unsuccessful April 2003 attempt to terminate the employment of the high school principal, Grieger. In August 2003, Zellner became the Union president and led the negotiations for a new CBA – Herrick and Korom represented the School Board in those negotiations. Later that year, Zellner and Herrick clashed when Zellner attempted to present the School Board with the no-confidence results regarding Herrick from the December 2003, Union survey. Again, in December 2003, following a contentious CBA negotiating session, Zellner and Herrick sparred and Herrick remarked that the "gloves would come off," unless the Union moved on. Herrick also advised Zellner that a prominent member of the community had expressed concern that Zellner was into pornography. However, Herrick also minimized the work-related significance of that concern. Despite those exchanges, nothing happened to Zellner.

In December of 2004, Zellner publically objected to the composition of the task force created by Herrick and the School Board. On January 18, 2005, Zellner's position, on behalf of the Union, was published in the local newspaper. About that time – specifically – on January 6, 2005, Zellner issued a press release regarding the no-confidence vote and caused

44

a full-page ad to be published in the local newspaper. Again, nothing happened to Zellner.

Zellner also participated in a January 24, 2005, meeting intended to improve relations between the Union and the District. Although agreeing that all discussions at a January 24, 2005, meeting would be "off the record" with no one taking notes, Herrick breached that agreement by disclosing the discussions to Pendergast.

In June 2005, the Union and the District were deadlocked over the terms of a new CBA. The stalemate over the District's proposal on the insurance issue – the same proposal that Zellner rejected on behalf of the Union in 2004 – continued to be a roadblock. In the fall of 2005, Zellner continued to be active in the Union as the high school's representative for the Union.

Additional District-related issues associated with Zellner emerged on December 15, 2005, with the publication of the newspaper article in which Zellner criticized the District. However, Zellner's focus on the temporal relationship between that issue and the December 20, 2005, meeting is erroneous because it does not give sufficient weight to the significance of Zellner's improper use of the District's computer to search for pornography.

A history of more than two-years of ongoing tensions between Zellner and Herrick and the District has been documented by the parties. According to Zellner, there was even greater discord. Nonetheless, Zellner was not faced with the prospect that his employment would be terminated until Zellner's search for pornography and the related images were detected on Zellner's District computer. The five-day temporal relationship between the

45

December 15, 2005, article and the December 20, 2005, meeting does not give adequate consideration to the considerable prior history of tensions between Zellner and Herrick, the District, and the School Board, due to Zellner's Union activity and the absence of any adverse employment action during that extended time period.

Nonetheless, in attempting to establish causation, Zellner places some reliance on the several years of acrimony between Zellner and the Union, and the District and the School Board. Despite factual disputes on some of the particulars of that tension, the facts support Zellner's characterization of the relationship as acrimonious. However, that ongoing discordant relationship does not furnish an explanation for the District's decision to discharge him from employment. To the extent that Zellner suggests that he was discharged because of his Union activity and acrimonious relationship with Herrick, that inference is not reasonable based on the evidence before the Court. A reasonable jury could not find that the acrimonious relationship triggered the termination of Zellner's employment.

Zellner also points to the District's new Policy on computer use as supportive of causation. However, that Policy applied to all District employees. Zellner has not presented any evidence that the Policy had any unique relationship to Zellner or his Union activities. The proposition that the District would adopt a new District-wide computer Policy applicable to all its employees in response to Zellner's participation in Union activities is not supported by the evidence or the reasonable inferences from that evidence. Moreover, Zellner's violation of the Policy triggered the events resulting in his discharge, not the Policy itself.

46

In addition, Zellner relies on Herrick's actions with respect to the installation of the monitoring software on Zellner's computer. However, those actions were triggered by the two re-imagings of Zellner's computer, Dries's opinion that it was likely that the problems with Zellner's computer were attributable to improper searches by Zellner, and the reliable information that Zellner had an interest in pornography.

Zellner also emphasizes the District's breach of its Policy's *proviso* requiring that any violations be reported to the perpetrator's immediate supervisor. Borkenhagen, a supervisor, violated the Policy when she reported Zellner's conduct to Herrick rather than Grieger, who was Zellner's immediate supervisor. However, Borkenhagen explained that she had reported the findings to Herrick because he was her supervisor and he had directed her to install the monitor on Zellner's computer. She reasoned that Herrick would do any necessary reporting of the findings to Grieger. Borkenhagen also relied upon her recollection of the information that Herrick provided to her regarding the report about Zellner's interest in pornography, the need to re-image Zellner's computer twice, and Dries's observation that Zellner might be improperly using the District's computer.

While Borkenhagen violated the District's Policy when she reported the results of the monitoring software to Herrick rather than to Grieger, Zellner has not presented any evidence suggesting that Borkenhagen took any position with respect to Zellner's Union activities. Although Herrick was Borkenhagen's supervisor and Borkenhagen was a member of the District's Leadership Council, there is no evidence that she was aware of the conflicts

47

that had flared between Herrick and Zellner or that she was allied with Herrick. Thus, a reasonable jury could not find that Borkenhagen's breach of the Policy is evidence that "but for" Zellner's Union activities, his employment would not have been terminated. Thus, Borkenhagen's violation of the District's Policy by reporting Zellner's improper use of his computer to Herrick, rather than Zellner's immediate supervisor, does not support the inference that the termination of Zellner's employment was an adverse employment action that would not have occurred "but for" Zellner's First Amendment activity.

In sum, despite construing the evidence and the reasonable inferences from that evidence in the light most favorable to Zellner, a reasonable jury could not find that "but for" Zellner's protected activity, the District would not have terminated his employment. Zellner also suggests that the December 20, 2005, meeting itself was motivated by his Union activity – however, any such claim also fails on the question of causation issue. Thus, Zellner's First Amendment claim is subject to dismissal on summary judgment because he has not presented sufficient evidence to establish a *prima facie* case.

*Pretext*

Failure to present sufficient evidence to establish a *prima facie* case provides the basis for granting the Defendants' motion for summary judgment with respect to Zellner's employment termination claim. However, even if Zellner had established a *prima facie* case, the claim would be subject to dismissal on the issue of pretext.

In *Kodish*, 604 F.3d at 501, the Court of Appeals commented that, in some of its prior decisions after setting forth the basic elements of a *prima facie* case, it had articulated the burden-shifting parameters first set forth in the Title VII employment discrimination context. Id. (citing *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009)).  The *Kodish* court raised, but did not resolve, the issue of whether the burden-shifting paradigm survives Gross.  *See Kodish*, 604 F.3d at 501.  The issue was not resolved because the *Kodish* plaintiff proceeded under the direct method of proof.  *See id.*  The Court of Appeals noted only that *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009), recognized that "*Gross* expressed significant doubt about any burden-shifting under the ADEA," however, the *Smith* court concluded that the but-for causation standard required by *Gross* does not conflict with the continued application of the *McDonnell Douglas* paradigm in age discrimination cases. *Kodish*, 604 F.3d at 501.

In the instant case, Zellner has presented a pretext argument. The Defendants have not raised an objection to the argument based on *Gross*.  In the absence of any contention by the Defendants that pretext is not to be considered in the wake of *Gross*, or a ruling on the issue by the Court of Appeals for this Circuit, the Court has analyzed Zellner's pretext argument.

Under the indirect method of proof, if a plaintiff establishes a *prima facie* case, the burden shifts to the employer to demonstrate that it would have taken the same action in the absence of the protected speech. *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670

(7th Cir. 2009). If the employer carries this burden, the plaintiff may still reach trial by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing the employee, at least in part, for exercising his First Amendment rights. *Id.*

The Defendants have presented evidence that the District terminated Zellner's employment because he searched for pornography using the District's computer. Despite more than two years of ongoing conflicts, Zellner participated in Union activities. Although Zellner and Herrick had confrontations and Zellner took positions that were adverse to those of the District, Zellner's employment was not terminated.

The Court's analysis of the pretext issue is analogous to its analysis of the evidence upon which Zellner relies in contending there was a causal relationship between his Union activity and the termination of his employment. The District's task includes educating students in a positive environment. In keeping with its task, the District's Policy does not tolerate teachers accessing offensive pictures, including pornography. Zellner's employment was terminated because he violated the Policy. For the same reasons the Court discussed with respect to causation, Zellner has not presented evidence indicating that the District's reliance on the pornography found on Zellner's computer was a pretext for punishing him for his Union activities. Thus, despite construing the evidence and the reasonable inferences from that evidence in the light most favorable to the non-movant, Zellner has not presented evidence upon which a reasonable jury could find that his Google image searches for pornography are

50

not the real reason that the District terminated Zellner's employment. Therefore, Zellner's First Amendment claim is dismissed on summary judgment.

*Municipal Liability*

Zellner seeks to hold the District liable for damages. His claims are also made against the individual Defendants in their official capacity which is the same as making a claim against the municipality. This Court has determined that Zellner has not presented sufficient evidence upon which a reasonable jury could find that he established a First Amendment violation. It is well established in this Circuit that a municipality's liability for a constitutional injury "requires a finding that the individual officer[ ][is] liable on the underlying substantive claim." *Treece v. Hochstetler*, 213 F.3d 360, 363 (7th Cir. 2003) (quoting *Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998)). *See also, City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Since Zellner has not presented sufficient evidence that he suffered a constitutional injury, he has no claim against the District. Therefore, the Court need not address whether Zellner has presented sufficient evidence to establish a basis for municipal liability.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

The Defendants' motion for summary judgment (Docket No. 86) is **GRANTED**;

This action is **DISMISSED**;

The Defendants may file a bill of costs with the Clerk of Court; and,

51

The Clerk of Court is **DIRECTED** to enter judgment accordingly;

Dated at Milwaukee, Wisconsin this 25th day of June, 2010.

**BY THE COURT**


_s/ Rudolph T. Randa_
**Hon. Rudolph T. Randa**
**U.S. District Judge**